10 P.3d 500 (2000)
102 Wash.App. 912
In re the DETENTION OF Kenneth GORDON.
State of Washington, Respondent,
v.
Kenneth Gordon, Appellant.
No. 42947-7-I.
Court of Appeals of Washington, Division 1.
October 16, 2000.
David Hirsch, Seattle, for Appellant.
Michele Hauptman, King County Prosecutor, Appellate Unit, Seattle, for Respondent.
AGID, C.J.
Kenneth Gordon appeals his commitment as a sexually violent predator under RCW 71.09 on numerous grounds. Because none of Gordon's arguments merit reversal, we affirm. The State raises a cross assignment of error about the meaning of "secure facility" in RCW 71.09. We reject the State's argument, but that determination has no effect on Gordon's present order of commitment.

FACTS AND PROCEDURAL HISTORY
Gordon was convicted of second degree rape and second degree robbery in 1984 and *501 received two 10 year concurrent sentences. Before his term of confinement expired in 1997,[1] the State filed a sexually violent predator civil commitment petition under RCW 71.09.030. A "sexually violent predator" is "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility."[2] A superior court judge determined there was probable cause to believe Gordon is a sexually violent predator, and a trial was held on the issue in April and May of 1998.
At trial, defense and State experts generally agreed that Gordon's diagnoses are schizophrenia,[3] antisocial personality disorder, and polysubstance abuse disorder,[4] but disagreed on the extent to which these conditions make Gordon likely to engage in predatory acts of sexual violence in the future. The jury found that Gordon is a sexually violent predator under RCW 71.09 and no less restrictive alternatives to total confinement were appropriate, and the trial court entered an order committing Gordon to the custody of the Department of Social & Health Services (DSHS) pursuant to RCW 71.09.060(1). Gordon appeals that order.

DISCUSSION
Eligibility for Commitment Under RCW 71.05
Gordon first contends that he could not be committed under RCW 71 .09, the sexually violent predator act (SVPA), because he suffers from a schizophrenia-type condition that qualifies him for commitment under RCW 71.05, the involuntary treatment act (ITA).[5] Essentially Gordon argues that if an individual has a major mental illness that could serve as the basis for commitment under the ITA, that person automatically qualifies for ITA commitment and is therefore per se ineligible for SVPA commitment. We disagree.
Even if schizophrenia were Gordon's only diagnosed condition, that would not automatically make him eligible for ITA commitment and consequently ineligible for SVPA commitment.[6] Indeed, despite Gordon's schizophrenia, the record is clear that he was not eligible for commitment under the ITA. All three experts at Gordon's probable cause hearing testified that he was ineligible for ITA commitment largely because his schizophrenia had been stabilized by medication. One of the defense's own experts, Dr. Mark Seling, staff psychologist in the adult psychiatric unit at Western State Hospital (WSH), testified that although he had evaluated Gordon for ITA commitment, he recommended against it because Gordon's schizophrenia had been stabilized by medication. The defense also called Dr. Stuart Wise, who testified that Gordon was not eligible for commitment under RCW 71.05 because "he clearly has a mental disorder, but he's not an eminent [sic] danger to himself, he's not an eminent [sic] danger to others." The State's expert, Dr. Barry Maletzsky, agreed that Gordon was not committable under the ITA because he did not pose an imminent danger to himself or others. Finally, defense counsel told the judge that "the evidence will show that [Gordon] is not presently committable under 71.05 because *502 ... he's been taking his medications." No different evidence was presented at the later trial.[7]
Because Gordon was ineligible for commitment under RCW 71.05, we hold the State's decision to pursue commitment under RCW 71.09 was proper. Our conclusion is bolstered by the legislative findings in RCW 71.09.010, which read in pertinent part: "The legislature finds that a small but extremely dangerous group of sexually violent predators exist who do not have a mental disease or defect that renders them appropriate for the existing involuntary treatment act, chapter 71.05 RCW...."[8] The Legislature plainly intended the SVPA to apply in just the sort of situation Gordon's case presents, i.e., when an individual has a mental condition that could be the basis for commitment under the ITA but, for whatever reason, commitment under that statute is either inappropriate or impossible.[9] We recognize the peculiar fact that Gordon's ineligibility for ITA commitment may be temporary to the extent it hinges on his compliance with and the effects of his medication. But endorsing Gordon's argument would be tantamount to instructing the State it should have released Gordon without pursuing SVPA commitment despite the fact that evidence existed to persuade a reasonable jury beyond a reasonable doubt that Gordon is a sexually violent predator. That result would be absurd and contravene the Legislature's purposes in enacting the SVPA.[10]
Jury Instructions
Relying on Kansas v. Hendricks,[11] Gordon claims the trial court erred by refusing to instruct the jury that commitment required proof that his alleged mental abnormality made it difficult, if not impossible, for him to control his dangerous behavior. Gordon's argument fails.
In Hendricks, the Supreme Court considered a substantive due process challenge to the definition of "mental abnormality" in Kansas' Sexually Violent Predator Act.[12] In its analysis, the Court made it clear that civil commitment is appropriate only for individuals whose dangerousness is, to some significant degree, beyond their control, which is determined by linking that dangerousness to the presence of a particular condition, such as a mental abnormality:
A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a "mental illness" or "mental abnormality." These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.[13]
The Court concluded that the Kansas Act meets this standard because it "requires a finding of future dangerousness, and then links that finding to the existence of a `mental *503 abnormality' or `personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior."[14] The Court was obviously troubled by the prospect of commitment based on only a general finding of dangerousness without requiring a causal relationship between that dangerousness and a condition, such as a mental illness or abnormality, that deprives the individual of his ability to control that dangerousness.
Like the Kansas statute, Washington's sexual predator commitment scheme requires the State to prove and a jury to find beyond a reasonable doubt that a causal link exists between an alleged sexual predator's mental abnormality or personality disorder and the likelihood that he or she will engage in predatory acts of sexual violence in the future.[15] It therefore meets the Hendricks Court's requirement that civil commitment not be predicated on dangerousness alone. Contrary to Gordon's assertion, Hendricks does not require a jury to make a specific finding that the mental abnormality or personality disorder makes it impossible, or at least difficult, for an individual to control his dangerous behavior.
Our reading of Hendricks here does not conflict with our remarks about that case in In re Detention of Brooks,[16] on which Gordon relies to argue that the court should have instructed the jury that "mental abnormality" requires a finding of dangerousness beyond control. In Brooks, we noted that Hendricks requires a showing that the "person's mental abnormality or personality disorder must make it `difficult, if not impossible, for the person to control his dangerous behavior.'"[17] This is correct. But Brooks did not go on to discuss how the Hendricks Court permitted the State to make that showingi.e., by proving dangerousness caused by mental abnormality, as explained above. Brooks does not stand for the proposition that something more is required.
Definition of "Secure Facility" in RCW 71.09
We next consider the State's contention that the trial court erred in ruling that Western State Hospital is not a "secure facility" as contemplated by RCW 71.09. The State argues that "[b]ased on this erroneous ruling, the trial court allowed Gordon to present testimony that he was not a sexually violent predator because if he was [sic] not confined in a secure facility under RCW 71.09, he would be confined in a locked ward at WSH under RCW 71.05 and in this way his dangerousness would be controlled." We reject the State's argument.
RCW 71.09.060 requires that if the court or jury determines that the person is a sexually violent predator, he be committed to a "secure facility" until the person is safe either "to be at large" or "to be released to a less restrictive alternative...."[18] The person must also be detained in a "secure facility" during all court proceedings.[19] DSHS may "not place the person, even temporarily, in a facility on the grounds of any state mental facility or regional habilitation center because these institutions are insufficiently secure for this population."[20] Because WSH is a state mental facility, this language clearly indicates that WSH, including its locked ward, is not a "secure facility." The unique concerns presented by sexually violent predators justify the Legislature's decision to place stringent restrictions on what type of facility constitutes secure housing for those *504 individuals. It is reasonable for the Legislature to conclude that this population needs to be secured not only from the public but also from other patients in mental institutions that are more informal than the Special Commitment Center (SCC). Accordingly, the trial court properly interpreted RCW 71.09.060 when it ruled that WSH is not a secure facility.
The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.
KENNEDY, J., and COX, J., concur.
NOTES
[1] Gordon's confinement lasted more than 10 years because he served his sentences for the 1983 rape and robbery consecutive to a third sentence for a 1980 second degree robbery conviction.
[2] RCW 71.09.020(1).
[3] There was testimony that Gordon has one or both of two sub-types of schizophreniaschizoaffective disorder and paranoid schizophrenia.
[4] The experts agreed that Gordon's polysubstance abuse disorder was in remission because he had been confined for many years preceding trial.
[5] Gordon cites cases demonstrating that schizophrenia may be a basis for commitment under RCW 71.05. See, e.g., In re Detention of LaBelle, 107 Wash.2d 196, 728 P.2d 138 (1986).
[6] We note that Gordon's position is weakened by his combination of psychiatric conditions that, according to the State's expert at trial, together predispose him to committing future acts of sexual violence.
[7] There was some testimonial evidence at trial, however, that Gordon would likely stop taking his medication and decompensate if he were released. Presumably he could then be eligible for commitment under RCW 71.05.
[8] RCW 71.09.010.
[9] Of course, specified criteria must be met before the State may even file a petition for SVPA commitment. See RCW 71.09.030.
[10] We decline to consider Gordon's contention that he was entitled to RCW 71.05's greater procedural protections because the major premise of that claim, that he was eligible for ITA commitment, is false.
[11] 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).
[12] Kansas' definition of mental abnormality is strikingly similar to Washington's: "Mental abnormality" means a "congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." Kan.Stat.Ann. § 59-29-a02(b). Hendricks unsuccessfully argued that in order to satisfy substantive due process, a civil commitment statute must require a state to prove by clear and convincing evidence that a person is both (1) "mentally ill" and (2) a danger to himself or others. See Hendricks, 521 U.S. at 356, 117 S.Ct. 2072.
[13] Id. at 358, 117 S.Ct. 2072 (citations omitted).
[14] Id.
[15] While Gordon is correct that the statute's definition of "mental abnormality" requires only that the abnormality predispose the individual to commit "criminal sexual acts in a degree constituting such person a menace to the health and safety of others," RCW 71.09.020(2), the causal link is found in the statute's definition of "sexually violent predator." See RCW 71.09.020(1) ("a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence") (emphasis added).
[16] 94 Wash.App. 716, 973 P.2d 486, review granted, 138 Wash.2d 1021, 989 P.2d 1136 (1999).
[17] Id. at 729, 973 P.2d 486 (quoting Hendricks, 521 U.S. at 358, 117 S.Ct. 2072).
[18] See RCW 71.09.060(1).
[19] See RCW 71.09.060(3).
[20] Id.