20 P.3d 1022 (2001)
In the Matter of the DETENTION OF Gordon Michael STRAUSS.
State of Washington, Respondent,
v.
Gordon Michael Strauss, Appellant.
No. 45137-5-I.
Court of Appeals of Washington, Division 1.
April 2, 2001.
As Modified May 2, 2001.
*1023 Jason Saunders, Seattle, for Appellant.
David J.W. Hackett, King County Deputy Pros. Atty., Seattle, for Respondent.
WEBSTER, J.
A jury committed Gordon Michael Strauss to a secure facility after finding that he is a sexually violent predator. Strauss appeals arguing that the trial court failed to hold a Frye[1] hearing on certain actuarial instruments used by experts to assess his risk of recidivism. He also contends that the court should have considered less restrictive alternatives short of total confinement. Finally, he maintains that the court erred by not instructing the jury to make a specific finding that he is unable to control his behavior. We affirm because the relevant scientific community generally accepts these particular actuarial instruments in predicting sexual offense recidivism, making a Frye hearing unnecessary. In addition, we find that the trial court allowed evidence of less restrictive alternatives and that there is no requirement that the jury make a specific finding on volitional impairment.

FACTS
On July 23, 1987, King County Superior Court convicted Gordon Michael Strauss of rape in the second degree by forcible compulsion. Strauss was scheduled for release from prison on October 10, 1998. Two days before this release date, the State filed a petition *1024 alleging that Strauss suffered from a mental abnormality or personality disorder that made him likely to commit sexually violent acts if not confined in a secure facility.
In a pretrial motion, Strauss moved to exclude the results of certain actuarial instruments that demonstrated his likelihood to reoffendthe Minnesota Sex Offender Screening Tool (MnSOST), the Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR), and the Violence Risk Assessment Guide (VRAG). After reviewing written arguments submitted by both sides, the trial court denied the motion to exclude. Also before trial, Strauss asked the court to admit evidence of less restrictive alternatives to total confinement. The trial court granted this request.
At trial, several women and police officers testified that Strauss had committed sexually violent acts in the past. S.L. stated that in 1978, when she was seventeen, she hitched a ride from Strauss about two hundred miles north of San Diego, California. According to S.L., Strauss drove his car off the main highway and forced her to have intercourse with him. After he let her leave, she flagged someone in a car to take her to the nearest sheriff. Upon confrontation by authorities, Strauss pled guilty to a misdemeanor offense of unlawful sexual intercourse.
Raj Johal, a Bellevue police officer, testified that in 1982, he responded to a call from D.E. who accused Strauss of raping her at knifepoint. In addition to forcing sexual intercourse, he made her orally copulate him and later raped her with the handle of a knife. He then drove her to a wooded area where he choked her and then raped her again. According to Officer Johal, D.E. had bruising on her neck and small lacerations on her throat and chest along with blood on her jacket and pants.
While the rape and kidnapping of D.E. was still under investigation, Strauss assaulted N.W. with a knife when she was walking home from work around two o'clock in the afternoon. He grabbed her from behind, placed a knife to her throat, and pulled her towards his car. When she somewhat broke free of his grip and yelled for help, he hit her on the head with the back of the knife. Moments later, a man in a service truck pulled up and yelled out to her. Strauss fled in his car, but not before N.W. was able to get his license plate number. Although the State charged Strauss with the rape and kidnapping of D.E., it dismissed the charges in exchange for Strauss's guilty plea to the assault of N.W.
Just 39 days after being released on parole for the assault conviction, Strauss grabbed P.G. while she was jogging in the morning and raped her. After ripping her clothing off, he forced oral and vaginal intercourse, among other things. About three months later, Redmond detectives identified Strauss as Gomez's attacker after receiving complaints from other women about his approaches. A jury convicted him of rape in the second degree. The trial court gave him an exceptional sentence of ten years.
Despite numerous treatment programs available, officials from the Department of Corrections testified that Strauss refused participation in any sexual deviancy counseling while imprisoned. Two psychologists called by the State gave expert testimony regarding his mental abnormality and personality disorder. Dr. Vincent Gollogly stated that Strauss suffers from paraphilia (not otherwise specified) rape and sexual sadism in addition to a personality disorder (not otherwise specified) with antisocial features. In Dr. Gollogly's opinion, Strauss presents a very high risk of committing future acts of sexual violence and his mental abnormality and personality disorder played a significant role. According to Dr. Gollogly, a secure facility is necessary to confine him because he is a high risk, has not participated in treatment and has previously offended shortly after leaving prison.
Dr. Dennis Doren testified that Strauss suffers from paraphilia (not otherwise specified) non-consent and a personality disorder (not otherwise specified) with antisocial features. In Dr. Doren's opinion, Strauss's personality disorder predisposes him to rape. To assess Strauss's recidivist risk, Dr. Doren relied on a number of actuarial instrumentsthe *1025 RRASOR, the MnSOST, the VRAG, the MnSOST-Revised, and the Structured Risk Assessment 1999. Based on these actuarial instruments, Dr. Doren believed that it is more likely than not that Strauss would commit a new sexual offense if not confined to a secure facility.
In defense of Strauss, Dr. Stephen Hart criticized the use of actuarial instruments to predict sexual offense recidivism but acknowledged that such instruments are generally more reliable than clinical judgment and that sexual predator evaluators use them. In the past, even Dr. Hart has used actuarial instruments when assessing risk in cases like this. He agreed that such instruments are relevant in an overall risk assessment and for comparative purposes.
After hearing the above testimony, the trial court instructed the jury that mental abnormality means a condition that affects the volitional capacity and further instructed the jury on volition, among other things. In a special verdict form, the jury found beyond a reasonable doubt that Strauss suffered a mental abnormality and/or personality disorder that made him likely to engage in predatory acts of sexual violence if not confined to a secure facility. The court ordered Strauss civilly committed in a secure facility under the custody of the Department of Social and Health Services for control, care and treatment. Strauss appeals.

DISCUSSION

I.

Actuarial Instruments
A. Frye Test
Strauss argues that the trial court erred by admitting expert testimony based on the MnSOST, RRASOR, and the VRAG. In Washington, novel scientific evidence is admissible only if it satisfies the standards set by Frye and ER 702. State v. Copeland, 130 Wash.2d 244, 255-61, 922 P.2d 1304 (1996). Contrary to Strauss's assertion, it is clear that the Frye test applies to civil commitment proceedings, not the test enunciated in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). See In re Detention of Campbell, 139 Wash.2d 341, 357-58, n. 3, 986 P.2d 771 (1999) (citing In re Personal Restraint of Young, 122 Wash.2d 1, 56-58, 857 P.2d 989 (1993)).
Under the Frye test, novel scientific evidence is admissible when the relevant scientific community has generally accepted the reliability of the underlying theory or principle. Copeland, 130 Wash.2d at 255, 922 P.2d 1304; Young, 122 Wash.2d at 56, 857 P.2d 989. If the evidence does not involve new scientific principles or methods of proof, a Frye inquiry is unnecessary. State v. Russell, 125 Wash.2d 24, 69, 882 P.2d 747 (1994). In reviewing a ruling based on Frye, an appellate court may look beyond the record to scientific literature and secondary legal authority. Copeland, 130 Wash.2d at 255-56, 922 P.2d 1304. Because a Frye issue involves a mixed question of law and fact, our review is de novo. Copeland, 130 Wash.2d at 255, 922 P.2d 1304.
According to Strauss, the trial court erred by not conducting a Frye hearing on the actuarial instruments because they are novel scientific techniques. Conversely, the State contends that these actuarial instruments are not novel scientific procedures and are otherwise generally accepted by the relevant scientific field.
Regardless of whether or not the actuarial instruments in this case are novel, it appears that the relevant scientific community generally accepts them. At trial, Dr. Doren testified that psychologists who are knowledgeable about assessing the risk of recidivism among sex offenders generally accept the actuarial instruments used in this case. Specifically, Dr. Gollogly said that most psychologists rely upon the VRAG when looking at the risk for general violence. Even the defense's expert, Dr. Hart, admitted using actuarial instruments such as the VRAG in sexual predator cases. Scientific literature and secondary legal authority also supports the view that the relevant scientific community generally accepts the three actuarial instruments in question as part of an overall risk assessment. See, e.g., John Monahan, Violence Risk Assessment, 57 Wash. & Lee *1026 L.Rev. 901, 914-14 (2000); R. Karl Hanson, What Do We Know about Sex Offender Risk Assessment?, 4 Psychol. Pub. Pol'y & L. 50, 67 (1998); Grant T. Harris and Marnie E. Rice, Appraisal and Management of Risk in Sexual Aggressors, 4 Psychol. Pub. Pol'y & L. 73, 90-91, 107(1998). But see Campbell, 139 Wash.2d at 375-79, 986 P.2d 771 (Sanders, J., dissenting) (neither clinical nor actuarial approaches are generally accepted by the psychiatric community). Based upon the record and other authority, we find that a Frye inquiry was unnecessary.
B. ER 702
Testimony regarding the actuarial instruments used in this case also satisfied the ER 702 standard. ER 702 requires that such testimony be helpful to the jury in understanding the evidence or determining a question of fact. Copeland, 130 Wash.2d at 256, 270, 922 P.2d 1304. We review admissibility under ER 702 for abuse of discretion. Copeland, 130 Wash.2d at 270, 922 P.2d 1304. Dr. Hart, the expert called by Strauss, admitted that actuarial instruments are useful for comparative purposes and a relevant consideration in an overall risk assessment. Based on this expert testimony alone, we cannot say that the trial court abused its discretion in admitting the actuarial results to assist the jury.
Strauss's complaints over the actuarial instruments go to the weight of the evidence and not the admissibility of the testimony. Campbell, 139 Wash.2d at 358, 986 P.2d 771. Strauss was able to point out the weaknesses of actuarial instruments through cross-examination of Drs. Doren and Gollogly and through testimony from his own expert, Dr. Hart. It is within the province of the jury to weigh such testimony. Campbell, 139 Wash.2d at 358, 986 P.2d 771 (citing Barefoot v. Estelle, 463 U.S. 880, 902, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)).

II.

Less Restrictive Alternatives
Next, Strauss argues that the trial court failed to consider less restrictive alternatives. RCW 71.09.020(7) defines a less restrictive alternative as a court-ordered treatment in a setting less restrictive than total confinement. In a footnote, Strauss says that he presents this argument to preserve the issue pending a decision by the Washington Supreme Court in In re the Detention of Brooks, 94 Wash.App. 716, 973 P.2d 486, rev. granted, 138 Wash.2d 1021, 989 P.2d 1136 (1999). In Brooks, the Court of Appeals stated that a trial court may consider less restrictive alternatives after ordering commitment without violating equal protection rights. Brooks, 94 Wash.App. at 720-23, 973 P.2d 486. The Court, however, has distinguished Brooks on equal protection grounds and has ruled that evidence of less restrictive alternatives is admissible before ordering commitment to rebut the State's evidence that he is likely to commit predatory acts of sexual violence if not confined in a secure facility. In re Detention of Ross, 102 Wash. App. 108, 113-17, 6 P.3d 625 (2000) (trial court abused its discretion by excluding evidence of less restrictive alternatives). We are mindful of Brooks and Ross, but find no error under the rules of either case.
Here, the trial court allowed Strauss to present evidence on less restrictive alternatives:
"The one issue that has been troubling for the Court and that I spent a great deal of time considering is this notion of LRA, least restrictive alternatives....
I've concluded that Respondents shall be permitted to present evidence regarding community placement and any conditions that are typically ordered for sexual offenders. That will be the limitation. It certainly appears ... that it's relevant to the risk factors that the State must prove. The Defendant is certainly entitled to present limited evidence of community placement conditions that are typical for sex offenders short of confinement in a secure facility when assessing Respondent's risk of reoffense."
RP 7/12/99 at 35-36.
Upon this ruling, the State immediately asked for reconsideration. The trial court denied reconsideration two days later. Although it may appear that the trial court *1027 imposed a limitation on evidence regarding less restrictive alternatives, Strauss's counsel acknowledged that such limitation existed based on the evidence available:
THE COURT: ... I understand the least restrictive alternative arguments by both sides, let me just be clear about one thing, I know that the defense does not agree with the Brooks decision, setting that aside for a moment, it's pretty clear Brooks says that ... less restrictive alternatives is not the proper subject for the jury, but ... it appears that the defense is arguing at the very least on the issue of the risk factor, we ought to be allowed to present evidence of court-supervised treatment, i.e., community placement, and what is typically ordered in a case of a sex offender. Is that what you are saying?
MS. JACKSON [ (Strauss's counsel) ]: Yes. We should be able to [do] both .... either through affirmative evidence, which we don't have in this case, or ... we should be able to cross-examine Dr. Doren as to what conditions short of total confinement he considered in his written analysis and bring those things forth to the jury.
RP 7/9/99 at 16-17. The trial court was willing to consider less restrictive alternatives. But, as Strauss's counsel acknowledged, there was little or no evidence to assist. The trial court ruled in Strauss's favor on this issue.

III.

Volitional Impairment
Strauss asserts that the trial court violated due process by not instructing the jury to find that he suffered from a volitional impairment rendering him dangerous beyond his control. He failed to raise this issue to the trial court. Generally, an appellate court may refuse to consider an issue not raised below. RAP 2.5(a); Doe v. Puget Sound Blood Ctr., 117 Wash.2d 772, 780, 819 P.2d 370 (1991). For the first time on appeal, however, a party may claim a manifest error affecting a constitutional right. RAP 2.5(a). Before addressing the merits of such a claim, a reviewing court must determine whether there is a constitutional issue at all. State v. Lynn, 67 Wash. App. 339, 345, 835 P.2d 251 (1992). This Court has ruled that substantive due process in a sexual predator case does not require a specific finding of volitional impairment. In re Detention of Gordon, 102 Wash.App. 912, 918-19, 10 P.3d 500 (2000) (construing Kansas v. Hendricks, 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)). Because this Court has already decided that due process does not require such a jury instruction, there is no constitutional issue here.

CONCLUSION
Because the relevant scientific community generally accepts the VRAG, RRASOR, and the MnSOST, the trial court was correct in denying a Frye hearing on the admissibility of these actuarial instruments. Also, there was no error in considering less restrictive alternatives and no requirement that the jury make a specific finding on volitional impairment.
We affirm.
AGID, C.J., and BAKER, J., concur.
NOTES
[1] Frye v. United States, 293 F. 1013, 34 A.L.R. 145 (D.C.Cir. 1923) (novel scientific evidence is admissible only if generally accepted by the relevant scientific community).