IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Detention of Jason Muns, | ) | No. 29920-1-III |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | UNPUBLISHED OPINION |
| v. | ) | |
| | ) | |
| JASON MUNS, | ) | |
| | ) | |
| Appellant. | ) | |

KORSMO, C.J. — Jason Muns challenges the jury's determination that he is a sexually violent predator (SVP), arguing that the legislature wrongly denied him a defense and that the trial court erred by allowing the State's expert to use a risk assessment tool without first conducting a *Frye*[1] hearing. We disagree with his description of the assessment guide and with his constitutional challenges. The judgment is affirmed.

---

[1] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

## FACTS

The facts underlying the sexually violent predator determination are largely not relevant to the disposition of the case. Mr. Muns has suffered from fetal alcohol spectrum disorder (FASD) since his birth in 1972.[2] He has been classified as developmentally disabled and has received Social Security Disability payments his entire adult life.

Mr. Muns began having run-ins with the law as an adult. He was investigated in 1994 at age 22 for possible child molestation while working as a bagger at a grocery store after he felt the crotch area of a baby's diaper while removing the child from the cart. No charges were filed. In 1997 he put his mouth to the breasts of a developmentally disabled woman on a bus during a group outing. He ultimately pleaded guilty to fourth degree assault for that incident. Later that year he was arrested for stealing women's panties from a clothesline; he admitted using them to masturbate. He received a suspended 90-day sentence for that offense.

The following year, Mr. Muns was charged with child molestation after again being accused of feeling a baby's diaper. The incident did not result in a conviction, although the specific disposition is unclear in this record. Later in 1998 he was convicted

---

[2] FASD describes a series of alcohol-related birth defects which include fetal alcohol syndrome.

2

of first degree child molestation for licking the vagina of a four-year-old girl. He was given a Special Sexual Offender Sentencing Alternative sentence, but he failed to live up to the requirements of that sentence and had his placement revoked. He was sent to the Twin Rivers facility at Monroe.

When his sentence was about to expire, the State petitioned to have Mr. Muns committed as a sexually violent predator to the Special Commitment Center (SCC). Trial testimony would eventually show that treatment providers did not consider him a pedophile, but it was uncontested that he had a paraphilia NOS (not otherwise specified)—urolagnia and fetishism. Additional recognized mental illnesses included bipolar disorder, a mood disorder NOS, borderline personality disorder, and a cognitive disorder NOS.

Prior to trial, the court granted the State's motion in limine to exclude evidence that Mr. Muns might be eligible to participate in the Community Protection Program (CPP), RCW 71A.12.200 et seq. The court noted that RCW 71.09.060(1) precluded consideration of the CPP in an SVP trial.

Mr. Muns filed a motion to preclude the State's expert, Dr. Shoba Sreenivasan, from using her unpublished dynamic risk assessment guide at trial. During the period

between the filing of the motion and the ruling, the assessment guide was published.[3]

Mr. Muns subsequently filed a supplemental motion to exclude the guide or hold a *Frye* hearing concerning it. The trial court denied the motions, concluding that the guide was an actuarial instrument that did not involve novel scientific theory.

Dr. Sreenivasan testified extensively at trial; her guide was featured during the testimony. She told the jury that the static risk tools available to her did not answer the question of whether Mr. Muns was likely to reoffend. However, her clinical judgment, backed by her own guide, convinced her that he was likely to reoffend.

The defense argued the case to the jury on the basis that the State had not met its burden. The static risk tools did not suggest he was a candidate for reoffense and the defense expert's clinical judgment was that he would not reoffend. After the jury concluded that Mr. Muns was a sexually violent predator, he timely appealed to this court.

## ANALYSIS

Mr. Muns argues that the trial court erred in not conducting a *Frye* hearing. He also argues, on several different bases, that RCW 71.09.060(1) is unconstitutional. We

---

[3] Amy Phenix & Shoba Sreenivasan, *A Practical Guide for the Evaluation of Sexual Recidivism Risk in Mentally Retarded Sex Offenders*, 37 J. AM. ACAD. PSYCHIATRY LAW 509-24 (Issue 4, Dec. 2009).

first address his argument concerning the assessment guide before turning to his constitutional challenges.

*Assessment Guide*

Appellant contends that Dr. Sreenivasan's guide was a dynamic risk assessment tool that needed to be subjected to analysis under *Frye* before the jury could hear about it. We disagree.

The question to be decided in an SVP proceeding is whether the State has shown that the subject of its petition, due to a mental abnormality or personality disorder, presents a high risk of engaging in predatory acts of sexual violence. *In re Pers. Restraint of Young*, 122 Wn.2d 1, 12, 857 P.2d 989 (1993). By its very nature, these actions are dependent upon expert testimony. *In re Det. of Campbell*, 139 Wn.2d 341, 357-58, 986 P.2d 771 (1999).

Before scientific evidence is admitted at trial, Washington courts require that it first be accepted in the scientific community. *State v. Copeland*, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996). This is the essence of the *Frye* standard as applied in Washington. *Id.* The reviewing court considers the issue de novo and is expected to conduct a searching review that may include scientific materials developed after trial. *Id.* at 255-56.

Although the standard for admission of scientific evidence has long been understood, the question of whether a specific type of evidence is subject to a *Frye*-type

5

review continues to be litigated. *E.g.*, *State v. Noltie*, 116 Wn.2d 831, 809 P.2d 190 (1991) (colposcope); *State v. Vermillion*, 112 Wn. App. 844, 51 P.3d 188 (2002) (tracking device). SVP litigation, because it is heavily dependent upon informed expert testimony, likewise sees regular *Frye* challenges. *E.g.*, *In re Det. of Strauss*, 106 Wn. App. 1, 20 P.3d 1022 (2001), *aff'd*, 149 Wn.2d 724, 72 P.3d 708 (2003).

In making their predictions of future dangerousness, the experts frequently rely upon assessment tools to support their own clinical judgment. *Id.* at 6. Most established tools track what are known as static risk factors—those that are immutable once they become present. Robert J. McGrath, Joy A. Livingston, & Gail Falk, *A Structured Method of Assessing Dynamic Risk Factors Among Sexual Abusers with Intellectual Disabilities*, 112 AM. J. ON MENTAL RETARDATION 221-22 (May 2007).[4] Because risk fluctuates with treatment and other changing factors, many professionals believe that recidivism can be more accurately predicted through the combined use of static risk factors along with an individual's dynamic risk factors, which can aggravate or mitigate the risk of reoffending. Leam A. Craig, *Controversies in Assessing Risk and Deviancy in Sex Offenders with Intellectual Disabilities*, 16 PSYCHOLOGY, CRIME & LAW 75, 88 (2010).

---

[4] An example is the Static-99 which bases recidivism on 10 dichotomous (i.e. yes/no) questions including "any convictions for non-contact sex offences," "any unrelated victims," "any stranger victims," "any male victims."

Dynamic risk factors are divided into two groups: stable and acute. Stable dynamic factors are "factors which are enduring but amenable to change over long periods of time." *Id.* at 80. "Acute dynamic factors are rapidly changing factors that change day-by-day or hour-by-hour." *Id.*[5]

Static risk factor assessment tools are actuarially based and no longer subject to a *Frye* challenge in Washington. *In re Det. of Thorell*, 149 Wn.2d 724, 755-56, 72 P.3d 708 (2003).[6] *Frye* likewise is inapplicable to the exercise of clinical judgment. *Id.* at 756 (citing *Campbell*, 139 Wn.2d at 358). Washington cases do not yet appear to have addressed the application of *Frye* to dynamic risk assessment tools. We agree with Mr. Muns's argument that a dynamic risk assessment instrument used to diagnose future dangerousness or assign a probability of reoffense rate would need to be the subject of a *Frye* analysis before use at trial. Our review of the literature[7] confirms the trial testimony

---

[5] Examples of stable dynamic factors include attitudes toward treatment and supervision, knowledge of own risk factors, sexual knowledge, mental health problems, and substance abuse; examples of acute factors include changes in behavior and attitude toward treatment providers, family, treatment itself, substance abuse, isolation, and change in routine. Douglas P. Boer, Susan Tough, & James Haaven, *Assessment of Risk Manageability of Intellectually Disabled Sex Offenders*, JOURNAL OF APPLIED RESEARCH IN INTELLECTUAL DISABILITIES 275, 280-82 (2004).

[6] *Det. of Strauss*, 106 Wn. App. 1, had previously identified three static risk assessments that could be used without a *Frye* hearing.

[7] No dynamic risk assessment instrument appears to have proceeded further than the third step of the scientific theory process. *See generally*, *Moore v. Harley-Davidson Motor Co. Grp., Inc.*, 158 Wn. App. 407, 419, 241 P.3d 808 (2010).

of Dr. Sreenivasan that most[8] dynamic risk tools are not used in the same manner as the static risk tools. Most certainly she did not treat her guide in that manner in this case.

Dr. Sreenivasan's assessment guide looks for stable and acute risk factors in sex offenders, checking for the presence or absence of over 40 different dynamic risk factors. They are divided into 8 sub-groups: global, diagnosis, social skills deficits, behavioral tendencies, knowledge levels, treatment progress, release environment, and acute factors. Pl.'s Ex. 16. In the course of her testimony, she went through each of the risk factors within each of the 8 groups, explaining to the jury which she saw present in Mr. Muns and which she did not.

Critically, she did not use her guide as a predictive tool. There was no scoring of answers or attempt to use the device to assign a level of probability to the risk of reoffense. She repeatedly rebuffed defense counsel's attempts during cross-examination to treat her "tool" as a scientifically validated risk assessment instrument. Report of Proceedings (RP) at 470-83. Instead, she used it as no more than a memory aid[9] designed to help her, and other clinicians, look for factors that other researchers suggested might

---

[8] One exception is the SONAR, an actuarially based dynamic risk tool designed to mitigate the results of static testing. *See* R. KARL HANSON & ANDREW HARRIS, PUBLIC SAFETY CANADA, SEX OFFENDER NEED ASSESSMENT RATING (SONAR): A METHOD FOR MEASURING CHANGE IN RISK LEVELS (2000).

[9] One of the early discussions of dynamic risk assessment tools noted that they were intended to be merely an *"aide memoire."* Boer, *supra* n.5, at 276.

have predictive value. The weight, if any, to be given the factors was left to her own clinical judgment.

The trial court denied the motion to exclude the test on the basis that it was an actuarial device. The court erred in that conclusion; both parties argued in their briefing to the trial court, and again in this court, that it was not. Despite this error, the trial court correctly concluded that no *Frye* hearing was necessary because the guide was not used as a scientific tool. We may affirm the trial court on any basis present in the record. *Swinehart v. City of Spokane*, 145 Wn. App. 836, 844, 187 P.3d 345 (2008).

Dr. Sreenivasan did not use the guide in any manner that would have required examination under *Frye*. There is no question that she could properly testify to the jury about the same factors without the presence of her written list. The fact that she wrote those factors down on a form—or even the back of an old envelope—did not add a scientific gloss requiring court inquiry into the scientific acceptance of her approach.

*Frye* is not implicated by Dr. Sreenivasan's testimony. Her tool was admitted into evidence only to illustrate her testimony and explain the factors used in informing her clinical judgment; it did not go to the jury as an exhibit. She did not claim it to be a

9

device of scientific truth or theory.[10] It was nothing more than a checklist of factors to consider.

The trial court properly denied the motion to exclude.

*RCW 71.09.060(1)*

Mr. Muns mounts several constitutional challenges to RCW 71.09.060(1). He asserts that its provision prohibiting him from arguing the existence of the CPP as an alternative placement violates his rights to equal protection of the laws as well as both procedural and substantive due process. The State contends that Mr. Muns lacks standing to make these challenges. We conclude that he has standing, but that the legislature could properly exclude mentally ill offenders from the CPP.

The problem arises from the fact that Mr. Muns is at an intersection of two statutes. The CPP, RCW 71A.12.200 et seq., was codified in 2006. It provides voluntary residential treatment in a supervised environment for people (1) who have been determined to have a developmental disability, (2) who have been charged with or convicted of a crime of sexual violence, and (3) who constitute "a current risk to others as

---

[10] Somewhat problematically, counsel for the State touted the guide in closing argument as being peer-reviewed, tending to suggest that Dr. Sreenivasan's judgment was more scientifically sound than the defense experts. RP at 1239. To the extent this argument attempted to attribute more to the guide than the State's own expert did, it was improper. However, there was no objection and we assume that defense counsel did not consider this to be error.

determined by a qualified professional." RCW 71A.12.210. The CPP is a restrictive placement. RCW 71A.12.230. A person accepted into the program may transition into lesser restrictive settings. RCW 71A.12.250, .260, .290.

The SVP statutes apply to a person who "has been convicted of . . . a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). In determining whether confinement is required, "the fact finder may consider only placement conditions and voluntary treatment options that would exist . . . if unconditionally released" from the SVP detention. RCW 71.09.060(1). The CPP may not be considered in making this assessment. *Id.* Court-ordered less restrictive alternatives likewise may not be considered when the fact finder is making the initial SVP determination. *Thorell*, 149 Wn.2d at 745-53.

The CPP covers people with developmental disabilities. The SVP program addresses people with mental abnormalities. People with both developmental disabilities and mental abnormalities could fall within the ambit of both programs. However, because the legislature has expressly directed that the CPP not be considered during the initial SVP hearing, the question arises whether this restriction is constitutionally valid. With that backdrop in mind, we now consider the arguments presented by the parties.

11

*Standing.* A party has standing to pursue an action when he is within the zone of interests protected by a statute and has suffered an injury in fact. *Branson v. Port of Seattle*, 152 Wn.2d 862, 875-76, 101 P.3d 67 (2004). Both parties appear to agree that Mr. Muns is within the zone of interests protected by the statute, but disagree on whether he has suffered any injury in fact. The State argues that Mr. Muns has no standing to present his constitutional challenges since he has not established that he would have been accepted into the CPP. *In re Det. of Mulkins*, 157 Wn. App. 400, 406, 237 P.3d 342 (2010). Mr. Muns responds that he did present evidence indicating his eligibility for the CPP and that *Mulkins* has been abrogated since the case it relied upon was expressly overruled. *See In re Det. of Post*, 170 Wn.2d 302, 316, 241 P.3d 1234 (2010) (overruling *State v. Harris*, 141 Wn. App. 673, 174 P.3d 1171 (2007)).

We do not share Mr. Muns's skepticism about the continued vitality of *Mulkins*. *Harris* was overruled on an evidentiary issue. *Post*, 170 Wn.2d at 316. *Mulkins*, in turn, is a standing case. There Division One of this court refused to consider a challenge to RCW 71.09.060(1) from an individual whose only foundation for claiming eligibility for the CPP was a form letter indicating that he was a potential candidate for the program. *Mulkins*, 157 Wn. App. at 406. *Mulkins* merely cited to language from *Harris* in its standing analysis and did not rely upon that case for its holding. *Id.* We believe that the *Mulkins* rule is still valid.

12

Nonetheless, we conclude that Mr. Muns has standing here. He did present evidence of his eligibility for the CPP in the form of testimony from a treatment provider who also evaluates CPP candidates.[11] In that expert's opinion, Mr. Muns did fit the criteria of the CPP program. We believe, therefore, that Mr. Muns had demonstrated sufficient injury to provide him standing to challenge the exclusion of the CPP from consideration in an SVP proceeding.

*Equal Protection.* All persons are entitled to the equal protection of the laws in accordance with the command of the Fourteenth Amendment. In reviewing alternative placement challenges under the SVP laws, our courts apply a rational basis test. *Thorell*, 149 Wn.2d at 748-49. This highly deferential standard of review looks to see if the government is pursuing a legitimate objective by a rational means. *Id.* at 749. The challenger bears the burden of establishing that a governmental classification is arbitrary; even unsupported rational speculation is sufficient to uphold a classification under a rational basis review. *Id.*

Initially, it is necessary to define the class allegedly being treated unequally. While facially treating all SVP respondents the same, in reality the statute affects only the

---

[11] Evidence that Mr. Muns desired to use the program would have made this an easier question.

subclass that is eligible for the CPP. That subclass, in turn, consists only of the developmentally disabled.

Despite the impact on that class of SVP respondents, we believe there are at least three rational bases for excluding the CPP from consideration as a voluntary treatment option. First, as argued by the State, is an interest in protecting those in the CPP program. While all participating in the CPP program are developmentally disabled, SVP respondents also are suspected of having mental illnesses that contribute to their predatory behavior. Protecting others in the CPP program from those believed to have additional problems is a rational basis for excluding SVP respondents.[12]

A second basis for excluding the CPP would be to treat all SVP respondents equally. As noted, an SVP respondent cannot present evidence of a court-ordered less restrictive alternative (LRA) at the initial SVP trial. *Thorell*, 149 Wn.2d at 751-53. The reason for this is the need for intensive in-patient treatment that follows the SVP determination. *Id.* at 752-53. Given that the highly structured CPP takes place in a very restrictive setting, it is similar in many regards to a court-ordered LRA.[13] In order to treat all SVP respondents equally and not allow the developmentally disabled subclass to

---

[12] This problem could be addressed simply by defining eligibility for the CPP program in terms that would exclude those with mental illness.

[13] Again, this issue also is one of definition and the legislature could have addressed the problem by defining an LRA in terms that included the CPP.

avoid the initial intense in-patient treatment, the legislature rationally could have decided that the CPP was not appropriate until after the initial SVP treatment had commenced.

The third basis is related to the first. While all involved in the CPP have developmental disabilities, not all of those eligible for that program also face challenges from mental illness. The legislature could rationally determine that the mental illness issues should be addressed first before turning to the developmental disabilities that also affect behavior. This is a rational basis for limiting participation in the CPP to those who would benefit most from it while requiring SVPs with developmental disabilities to first undergo mental illness treatment.

There are rational bases for excluding the CPP from consideration at the initial SVP trial. Mr. Muns therefore has not shown that the classification is arbitrary. RCW 71.09.060(1) does not violate the equal protection clause of the constitution.

*Procedural Due Process.* Mr. Muns next argues that the exclusion of the CPP from the initial SVP trial violates his right to procedural due process. This argument pits his liberty interest against the State's interests in public safety and treatment for Mr. Muns. We conclude that he has not established any error.

To balance Mr. Muns's liberty interest against the State's counteracting interests, the court applies the *Mathews* three-part balancing test:

> [F]irst, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through the

15

procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

The first factor heavily favors Mr. Muns; his interest in remaining free of civil commitment is very strong. *E.g., Vitek v. Jones*, 445 U.S. 480, 491-92, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980). The government has legitimate interests in providing care for those who cannot take care of themselves and in protecting the public from those who are dangerous. *E.g., Addington v. Texas*, 441 U.S. 418, 426, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979).

The second *Mathews* factor is the one in dispute. Mr. Muns argues that depriving the jury of evidence of a program that he could take part in unacceptably raises the risk that the jury will erroneously commit him as an SVP. We disagree. "Given the extensive procedural safeguards in chapter 71.09 RCW, the risk of an erroneous deprivation of liberty under the challenged amendments is low." *State v. McCuistion*, 174 Wn.2d 369, 393, 275 P.3d 1092 (2012) (rejecting procedural due process challenge to 2005 amendments to SVP statutes that altered evidence defense could present), *cert. denied*, 133 S. Ct. 1460, 185 L. Ed. 2d 368 (2013). The same result follows in this case.

Mr. Muns is still permitted to present evidence that he can be treated in the community. He simply is not permitted to use the CPP. In the absence of any evidence

16

that CPP was the only voluntary program available, exclusion of the CPP from his trial did not present a risk of a wrongful determination. On balance, the *Mathews* factors do not demonstrate that Mr. Muns's procedural due process rights were violated.

Exclusion of the CPP from consideration as a voluntary community-based program did not violate Mr. Muns's procedural due process rights.

*Substantive Due Process.* Mr. Muns also argues that his substantive due process rights also were violated because exclusion of the CPP "permits the State to confine him even if he would be . . . 'safe to be in the community.'" Brief of Appellant at 28. This argument overstates the case and is simply a relabeling of his procedural due process argument.

Substantive due process "requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha v. Louisiana*, 504 U.S. 71, 79, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992). The constitutionality of the State's police power to subject certain citizens to involuntary confinement is firmly settled. *Young*, 122 Wn.2d at 27.

Excluding the CPP evidence did not change the State's burden of proof in this proceeding nor did it change the fact that the State proved Mr. Muns was dangerous. The most that can be said is that this portion of the statute removes a defense argument that the CPP was adequate protection for the public. This question is one of procedural due

No. 29920-1-III
In re Detention of Muns

process. *Mathews*, 424 U.S. at 335. Whatever its evidentiary impact on the defense contesting one of the questions the State needed to prove, the exclusion did not change the State's substantive obligation to prove that Mr. Muns was dangerous and in need of treatment. *Young*, 122 Wn.2d at 31.

Because the exclusion only presents a question of procedural due process, Mr. Muns's claim of substantive due process is without merit.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Korsmo, C.J.

WE CONCUR:

Brown, J.

Kulik, J.