NO. 4-00-0556

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

RAYMOND RAINEY,

Defendant-Appellant.

)

)

)

)

)

)

)

)

Appeal from

Circuit Court of

Morgan County

No. 98MR41

Honorable

J. David Bone,

Judge Presiding.

_________________________________________________________________

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In September 1998, the State filed a petition under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 through 90 (West 1998)) to have defendant, Raymond Rainey, committed as a sexually violent person.  In February 2000, defendant admitted the allegations set forth in the petition.  Following a May 2000 dispositional hearing, the trial court ordered defendant committed to a secure facility.  

Defendant appeals, arguing that (1) his commitment is void for lack of jurisdiction because he was not served with a summons, pursuant to sections 2-201(a) and 2-203 of the Code of Civil Procedure (Code) (735 ILCS 5/2-201(a), 2-203 (West 1998)); (2) his due process rights were violated because he was not properly served summons; (3) the trial court erred by accepting his admission to the State's petition; (4) he was denied effective assistance of counsel; and (5) the court abused its discretion by committing him to a secure facility.  We affirm.

I. BACKGROUND

In 1993, defendant was found guilty but mentally ill of aggravated criminal sexual abuse (720 ILCS 5/12-16 (West 1992)).  The trial court later sentenced him to 12 years in prison.  (Defendant was initially incarcerated at the Dixon Special Treatment Center (Dixon); he was later transferred to Big Muddy Correctional Center (Big Muddy).)  In March 1997, defendant was released on mandatory supervisory release (MSR).  In April 1998, his MSR was revoked for driving with a suspended license and failing to attend sex-offender counseling.  Defendant was imprisoned again at Big Muddy and scheduled to be released on MSR in October 1998.

On September 28, 1998, the State filed a petition under the Act, seeking to have defendant committed as a sexually violent person.  The petition alleged that (1) defendant suffered from (a) pedophilia, (b) alcohol abuse, (c) post-traumatic stress disorder, (d) antisocial personality disorder, and (e) borderline personality disorder; and (2) it was substantially probable that he would engage in sexually violent acts if not committed to a secure facility.  On that same date, the trial court entered an order of 
habeas
 
corpus
 
ad
 
prosequendum
, which indicated that a probable-cause hearing had been set for September 30, 1998.  (Section 30(b) of the Act provides that when the person named in the petition is in custody, a probable-cause hearing shall be held within 72 hours of the filing of the petition.  725 ILCS 207/30(b) (West 1998).)

At the September 30, 1998, probable-cause hearing, Dr. Jacqueline Buck, a clinical psychologist, testified as an expert on sex-offender treatment and evaluation.  She had reviewed defendant's "master file" maintained by the Department of Corrections (DOC) and conducted a two-hour clinical interview with him in July 1998.  Defendant's master file showed the following prior convictions for sex offenses:  (1) indecent liberties with a child in 1978; (2) contributing to the sexual delinquency of a child in 1984; (3) aggravated criminal sexual assault in 1986; and (4) aggravated criminal sexual abuse in 1993.

When Buck interviewed defendant, he could not remember anything about the 1978 offense.  Regarding the 1984 conviction, he said he was accused of fondling his niece, who was then 9 or 10 years old.  In 1986, he was convicted of aggravated criminal sexual assault of his live-in girlfriend's daughter, who was then 11 or 12 years old.  When Buck asked defendant about the 1986 incident, he became very angry and stated that "they gave him 30 years for something he didn't do."  Defendant's 1993 conviction was for the 1991 sexual assault of his live-in girlfriend's niece, who was then nine years old.  Defendant explained to Buck that his girlfriend discovered him in a room with her niece and misunderstood what was happening.  He insisted that he had not done anything wrong.

Buck testified generally that defendant did not accept responsibility for his offenses and, instead, blamed "anybody and everybody but himself."  He did not show any remorse or empathy for the victims.  

Defendant's master file also showed that when he was at Dixon, he was disciplined for participating in sexual behavior with a young man and transferred to Big Muddy.  At the end of 1995, he was again involved in sexual misconduct with a young male.  In early 1996, defendant agreed for the first time to participate in sex-offender treatment.  (Defendant had been offered sex-offender treatment since 1993.)  He was later confronted by his peers and the treatment staff on at least three occasions for inappropriately associating with young males "on the unit."  Defendant had also been put in segregation for participating in mutual oral masturbation.  The staff ultimately dismissed defendant from the treatment program.  

When defendant was paroled in 1997, he was required to attend sex-offender treatment as a condition of his MSR.  During the first three months following his release, defendant met and began living with a woman, Roberta, and Roberta's hearing-impaired daughter, Megan, who was nine years old at the time of the September 1998 hearing.  Sometime prior to the hearing, defendant and Roberta married.  When his parole was revoked in April 1998, defendant had not attended sex-offender treatment in the previous nine months.  

Following defendant's return to Big Muddy, he spoke with Megan on several occasions via a telecommunications device for the deaf (TDD).  Counselors at Big Muddy monitored those calls, and Buck examined transcripts of TDD calls between defendant and Megan that occurred in the summer of 1998.  In 11 calls, defendant spoke to Megan about going fishing and camping alone with him.

Buck diagnosed defendant with the following five mental disorders:  (1) pedophilia, sexually attracted to females, non-exclusive type; (2) alcohol abuse in a controlled environment; (3) post-traumatic stress disorder, chronic; (4) antisocial personality disorder; and (5) borderline personality disorder.  Buck testified about each diagnosis in some detail.  In her opinion, within a reasonable degree of psychological certainty, it was substantially probable that defendant would commit future sexually violent acts.

The State provided no other testimony, and defendant's counsel offered no argument.  The trial court then initiated the following colloquy:

"THE COURT:  I only have one question before a finding of probable cause, counsel.  Looking at the statute which we're dealing with, 725 ILCS 207[/1 through 90 (West 1998)­], and under that [s]ection 20, it says civil nature of proceedings, provisions of the civil practice law apply, and there's nothing in the file to indicate [defendant has] been served with summons or any notice of these proceedings.  So I may not have any jurisdiction.

MR. COLBURN [(State's Attorney)]:  Just, he'd been served in [DOC] and was just further served this morning by sheriff's deputies, Your Honor (handing document to the court).

THE COURT:  All right.  Next question.  I don't mean to be troublesome here, but if we're going to apply, use a civil proceeding in the, under the Civil Practice Act, I think everything's initiated by the service of summons.  Notice of the hearing wouldn't necessarily be, necessarily suffice to serve as summons.  It's just a question.  They say the entire [Civil Practice] Act applies.  I don't know how you've done it elsewhere, but I just, I hate to leave just a question of jurisdiction.  It would be such a simple act just to serve him with summons and a copy of the petition, just do it here in court, hand him a summons.  

MR. COLBURN:  That's what he was served with, Your Honor.  That's what that reflects.  He was served with the petition and summons again today by the deputies, the entire petition prior to coming into the courtroom.

MR. CREWS [(Defense counsel)]:  Your Honor, I'd stipulate to that.  I was present when Deputy Miller served [defendant] with a copy of the petition.

THE COURT:  All right.  Again, I don't mean to be highly technical.

MR. CREWS:  I understand.

THE COURT:  But there's no evidence that summons was issued.  He, the deputy served him with a copy of the petition and the order of detention, but was a summons issued in that?  The [c]ourt gets jurisdiction from the issuance and service of summons under the Civil Practice Act.  Unless he enters his appearance, that's all involuntary.

MR. CREWS:  We'll waive service, Your Honor, and enter an appearance in this case.

THE COURT:  That would suffice.  ***  Defendant waives service of summons, and there is proof of service of, notice of the filing of the petition and order of detention and hearing in this cause on file."

The trial court then found probable cause, noting that Buck's testimony was unrebutted, and ordered defendant transferred to the Department of Human Services (Department) for an evaluation, pursuant to section 30(c) of the Act.  725 ILCS 207/30(c) (West 1998).

From November 1998 through January 2000, the trial court granted several continuances, in part, to accommodate defendant's search for an expert or professional to conduct an independent evaluation.  In September 1999, defendant filed a report prepared by Dr. Larry Davis, a psychiatrist.  According to Davis' report, he evaluated defendant in July 1999.  Davis disagreed with Buck's diagnoses of post-traumatic stress disorder, antisocial personality disorder, and borderline personality disorder.  He diagnosed defendant with pedophilia and chronic depression. 

In Davis' interview with defendant, defendant denied responsibility for the incidents that led to his 1984 and 1986 convictions.  When Davis asked defendant about his feelings toward his victims, he replied, "I don't think they were harmed because of my meeting with them."  

Davis also opined as follows:  "[Defendant's] IQ [(intelligence quotient)] is 80 at best and his ability to have effectively gained useful information from a sex[-]offender treatment program based on discussion and thinking is poor."  Davis recommended that defendant receive outpatient therapy "at a practical and simple level" with an emphasis on behavior modification.  Davis also stated that if his recommendation were accepted, defendant's parole officer and psychotherapist would have to monitor defendant's access to "familiar pubertal or pre-pubertal girls.  He must not be allowed 
any
 ongoing contact with such young females."  (Emphasis in original).  Davis concluded that it was not substantially probable that defendant would reoffend.

In February 2000, the trial court conducted a hearing to accept defendant's admission to the allegations set forth in the State's petition.  At that hearing, defense counsel informed the court that he had gone through the petition with defendant and explained "each and every paragraph" to him.  The court elicited from defendant that he had an eighth-grade education and that he was able to read the petition but did not understand it.  The court then began to go through the petition in detail.  When the court reached paragraph four of the petition, the following colloquy occurred:

"THE COURT:  And then it says in [paragraph] four that you have various mental disorders.  There are five of them there, I think:  Pedophilia, sexually attracted to females, nonexclusive type; alcohol abuse in the controlled environment; post[-]traumatic stress disorder; chronic anti[]social personality disorder; and borderline personality disorder.  Do you understand what it says?

DEFENDANT:  Well, I do, but I don't.

THE COURT:  Well, I'm not sure I understand what each of them mean.  I think they're probably discussed in the report of the psychologist that's attached.  Is there one attached to the petition?

MR. CREWS:  Yes, sir, Your Honor.

THE COURT:  Maybe counsel can help me with that.

DEFENDANT:  I know from my understanding, people explaining it to me what they mean.  I can tell you I don't fit in either one of them."

The court then discussed with counsel whether it could certify that defendant "knowingly and intelligently" admitted the petition in light of defendant's disputing the mental health diagnoses.  The resolution of that issue occurred off the record. 

The trial court then asked defendant a series of questions to ascertain whether defendant understood that by admitting to the petition, he was knowingly giving up certain rights and that he was voluntarily entering the admission.  At the conclusion of the hearing, the court found that defendant "knowingly, understandingly, and voluntarily has executed the sexually violent person admission and waiver" and "knowingly, understandingly, voluntarily waives the rights expressed and admits the sexually violent persons petition."

The trial court then asked the State to provide the factual basis for defendant's admission to the State's petition.  The State replied by reciting a summary of Buck's credentials and the findings and conclusions that she would testify to.  The State added that the Department's evaluator, Dr. Phil Reidda, a board-certified psychologist, confirmed Buck's findings.  The court found a factual basis for defendant's admission.  The court also found that defendant's admission was knowingly and voluntarily made. 

At the May 2000 dispositional hearing, Reidda testified that he had interviewed defendant on three occasions.  During those interviews, defendant discussed his four prior arrests for pedophilia incidents; he also discussed a couple of incidents that had gone unreported.  Reidda also testified regarding defendant's sexual misconduct while incarcerated.  Reidda described the TDD transcripts as follows:  "[Defendant] was anticipating a release, and he wanted this girl to agree to do something with him by herself.  And she was, you know, he was very attentive to her, very supportive to her, but also very manipulative."  The doctor who monitored the call at Big Muddy felt that it was an attempt at "grooming" Megan.  Reidda explained that "grooming" is a term used to describe the way in which sexual predators set up their victims.  

Reidda diagnosed defendant with pedophilia, borderline personality disorder, and antisocial personality disorder. Reidda's risk assessment of defendant indicated that he was at "very high risk" for reoffending, and Reidda answered in the affirmative when asked whether it was "substantially probable" that defendant would reoffend.  

Reidda also conducted a predisposition investigation of defendant.  Defendant was at that time detained but not involved in treatment.  Defendant had vague plans to live with a cousin if he was released.  Defendant said that he was in favor of clinical treatment if it did not interfere with his work.  Reidda found that defendant was still "unable to understand the gravity of [his criminal] behavior or acknowledge his participation in it."  Reidda considered the available options and concluded that the least-restrictive care that would be best for defendant would be secure care.  He stated that defendant needed to be monitored 24 hours a day because he had "a 20[-]year history of very poor impulse control over his behavior, and, in fact, nothing [has] changed.  ***  Even in prison he has acted on those sexual impulses."  

William Loveland testified that he was defendant's counselor while defendant was on MSR in July 1997.  Counseling sessions were scheduled to occur weekly.  Between July 1, 1997, and August 28, 1997, defendant attended only five sessions and then stopped attending altogether.    

Brad Besson testified that he was the DOC officer responsible for monitoring defendant on MSR from March 1997 to April 1998.  At the time defendant's MSR was revoked, Besson had no indication that defendant had reoffended.

Defendant testified he was in the process of divorcing Roberta and would not be living with her and Megan if he was released.  He would live with his cousin in Ripley where there would be "no children around."  He would attend counseling and understood that if he ceased to do so he would be returned to prison.

At the conclusion of the hearing, the trial court ordered defendant submitted to the State's sexually violent persons treatment and detention center.  This appeal followed. 

II. ANALYSIS

A. Service of Summons 

1. 
The
 
Trial
 
Court's
 
Jurisdiction

Defendant first argues that the trial court lacked personal jurisdiction over him at the probable cause hearing because he was not served summons, pursuant to section 2-203 of the Code (735 ILCS 5/2-203 (West 1998)).  We disagree.

Section 20 of the Act provides as follows:

"The proceedings under this Act shall be civil in nature.  The provisions of the Civil Practice Law, and all existing and future amendments of that Law shall apply to all proceedings hereunder except as otherwise provided in this Act."  725 ILCS 207/20 (West 1998).

The Civil Practice Law was incorporated into the Code when it was enacted in 1982.  See Pub. Act 82-280, eff. July 1, 1982 (1981 Ill. Laws 1381).  In civil suits, a trial court is vested with personal jurisdiction when an action is filed and proper summons is served on the defendant.  
Mugavero v. Kenzler
, 317 Ill. App. 3d 162, 164, 739 N.E.2d 979, 981 (2000); 735 ILCS 5/2-201 (West 1998).  However, jurisdiction may also be obtained when the party, although not served, participates in the proceedings.  Such participation constitutes a submission to the court's jurisdiction and forfeits the right to later contest the court's personal jurisdiction over the party.  
Morey Fish Co. v. Rymer Foods, Inc.
, 240 Ill. App. 3d 61, 67, 608 N.E.2d 74, 78 (1992) 
rev'd
 
on
 
other
 
grounds
, 158 Ill. 2d 179, 632 N.E.2d 1020 (1994).  Whether a court had personal jurisdiction is a question of law, which we review 
de
 
novo
.  
Mugavero
, 317 Ill. App. 3d at 164, 739 N.E.2d at 981.   

In this case, we conclude that the trial court obtained personal jurisdiction over defendant when defendant appeared and participated at the probable-cause hearing.  In so concluding, we acknowledge that defendant had little choice but to appear in court, given his incarceration and the court's order of 
habeas
 
corpus
 
ad
 
prosequendum
.  However, defendant was represented by counsel at the probable cause hearing, and his counsel expressly waived service of summons.  Defendant thereby submitted to the court's jurisdiction. 

2. 
Defendant's
 
Due
 
Process
 
Rights

Defendant next argues that the State's failure to properly serve him with summons deprived him of his right to due process of law under the fourteenth amendment to the United States Constitution and section 2 of article I of the Illinois Constitution (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2).  Specifically, he contends that under section 35(b) of the Act, he is entitled to "[a]ll constitutional rights available to a defendant in a criminal proceeding" (725 ILCS 207/35(b) (West 1998)).  Defendant thus asserts that he was entitled to criminal due process and his counsel was without authority to waive his due process rights on his behalf.  We disagree.

Proceedings under the Act are civil in nature.  
In re Samuelson
, 189 Ill. 2d 548, 559, 727 N.E.2d 228, 235 (2000).  "Because proceedings under the *** Act are civil in nature, they do not trigger [defendant's] criminal constitutional rights."  
In re Tiney-Bey
, 302 Ill. App. 3d 396, 399, 707 N.E.2d 751, 754 (1999).  Section 35 of the Act, the purported source of defendant's criminal due process rights, addresses the defendant's rights at a 
trial
 under the Act.  725 ILCS 207/35(b) (West 1998); 
Tiney-Bey
, 302 Ill. App. 3d at 401, 707 N.E.2d at 755.  Section 25(c) of the Act sets forth those rights to which a defendant is entitled at 
any
 
hearing
 under the Act as follows:  (1) the right to be present and represented by counsel, (2) the right to remain silent, (3) the right to present and cross-examine witnesses, and (4) the right to have a hearing recorded by a court reporter.  725 ILCS 207/25(c) (West 1998).  Therefore, apart from the recognition of these enumerated rights, preliminary proceedings under the Act are civil in nature and governed by the Code.  As previously stated, a party forfeits service of summons in civil proceedings by submitting to the court's jurisdiction.

Moreover, even in a criminal law context, defendants do not have an absolute right to personally make all decisions involving matters of trial strategy.  
People v. Brocksmith
, 162 Ill. 2d 224, 229, 642 N.E.2d 1230, 1232 (1994).  In 
Brocksmith
, the supreme court recognized the following four decisions as being personal to a defendant:  (1) what plea to enter, (2) whether to waive a jury trial, (3) whether to testify on his own behalf, and (4) whether to appeal.  
Brocksmith
, 162 Ill. 2d at 227-28, 642 N.E.2d at 1232.  The court then held that defendants also have the right to personally decide whether to submit a lesser-included offense instruction to the jury.  
Brocksmith
, 162 Ill. 2d at 229-30, 642 N.E.2d at 1233.  "Beyond these *** decisions, however, trial counsel has the right to make the ultimate decision with respect to matters of tactics and strategy after consulting with his client."  
People v. Ramey
, 152 Ill. 2d 41, 54, 604 N.E.2d 275, 281 (1992).  Therefore, even if we were to consider the circumstances this case presents under a criminal law standard, we would conclude that defendant's due process rights were not violated when his counsel waived service of summons. 

B. Defendant's Admission to the State's Petition

Defendant next argues that the trial court abused its discretion by accepting his admission to the allegations set forth in the State's petition because he denied that he suffered from any of the mental disorders alleged in the petition.  We disagree.

The Act defines a sexually violent person as follows:  "a person who has been convicted of a sexually violent offense, *** and who is dangerous because he *** suffers from a mental disorder that makes it substantially probable that [he] will engage in acts of sexual violence."  725 ILCS 207/5(f) (West 1998).  

All rules of evidence that apply to a criminal proceeding apply at a defendant's trial under the Act, and the defendant is afforded the same constitutional rights as a defendant in a criminal trial.  725 ILCS 207/35(b) (West 1998).  Accordingly, if defendant's admission to the allegations set forth in the State's petition would pass muster if it had been entered as a guilty plea in a criminal proceeding, it will withstand scrutiny under the Act.

In criminal proceedings, the decision whether to accept or reject a defendant's guilty plea is a matter within the trial court's discretion.  
People v. Peterson
, 311 Ill. App. 3d 38, 45, 725 N.E.2d 1, 7 (1999).  A trial court may accept a defendant's guilty plea even when the defendant refuses to admit that he committed the crime alleged or professes his innocence, if a factual basis for the plea is otherwise demonstrated. 
 
People v. Pugh
, 157 Ill. 2d 1, 25, 623 N.E.2d 255, 266 (1993)
.  Moreover, Supreme Court Rule 402, which governs the acceptance of guilty pleas, requires trial courts to personally address defendants to establish that they are entering a plea knowingly and voluntarily.  177 Ill. 2d Rs. 402(a), (b).  Rule 402 does not, however, require trial courts to address the defendant regarding the State's representations that purportedly constitute the factual basis for the guilty plea.  
In re C.K.G.
, 292 Ill. App. 3d 370, 378, 685 N.E.2d 1032, 1037 (1997); 177 Ill. 2d R. 402(c).  

We have reviewed the transcript of the February 2000 hearing with the above-stated principles in mind, and we conclude that the trial court did not abuse its discretion by accepting defendant's admission.  If defendant had been entering a guilty plea in a criminal case, his denial of the existence of certain facts, even those that constitute an element of the charged offense, would not require the trial court to reject his plea.  See 
Pugh
, 157 Ill. 2d at 25, 623 N.E.2d at 266.  Similarly, defendant's assertion that he did not have any of the mental illnesses alleged in the petition did not indicate that his admission was not knowingly and voluntarily made.

C. Ineffective Assistance of Counsel

Defendant next argues that he was denied effective assistance of counsel.  Specifically, he contends that he received ineffective assistance of counsel when his trial counsel (1) waived service of summons, (2) allowed him to admit the State's petition
, and (3) failed to introduce Davis' report at the dispositional hearing.  We disagree.   

Two possible bases for a right to the effective assistance of counsel arise under the Act:  (1) a State or federal constitutional right or (2) a statutory right implicitly arising from the statutory requirement that defendants under the Act be provided counsel.  See 
In re Carmody
, 274 Ill. App. 3d 46, 54, 653 N.E.2d 977, 983 (1995).  Because courts will avoid determining a constitutional question if the issue can be resolved on other, nonconstitutional grounds (
In re S.G.
, 175 Ill. 2d 471, 479, 677 N.E.2d 920, 924 (1997)), we address the statutory issue first.

Section 25(c)(1) of the Act provides as follows:

"(c) Except as provided in paragraph (b)(1) of [s]ection 65 and [s]ection 70 of this Act, at any hearing conducted under this Act, the person who is the subject of the petition has the right to:  

(1) To be present and to be represented by counsel.  If the person is indigent, the court shall appoint counsel."  725 ILCS 207/25(c)(1) (West 1998).

Section 35(b) provides that "[a]ll constitutional rights available to a defendant in a criminal proceeding are available" to defendants on trial under the Act.  725 ILCS 207/35(b) (West 1998).

In a sixth amendment context, the United States Supreme Court has held that "'the right to counsel is the right to the effective assistance of counsel.'"  
Strickland v. Washington
, 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692, 104 S. Ct. 2052, 2063 (1984), quoting 
McMann v. Richardson
, 397 U.S. 759, 771 n.14, 25 L. Ed. 2d 763, 773 n.14, 90 S. Ct. 1441, 1449 n.14 (1970).  

In 
Carmody
, this court construed section 3-805 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/3-805 (West 1992)) and held that (1) the statutory right to counsel contained therein provides persons subject to involuntary commitment with the right to effective assistance of counsel and (2) the effectiveness of such counsel is to be measured under the 
Strickland
 standard.  
Carmody
, 274 Ill. App. 3d at 55, 653 N.E.2d 984.  In so holding, we reasoned that just as the Supreme Court had determined that it would be "incongruous" for the sixth amendment to require the assistance of counsel but permit that counsel to be "prejudicially ineffective," the legislature could not have intended to provide individuals subject to involuntary commitment with the right to counsel and permit that counsel to be prejudicially ineffective.  
Carmody
, 274 Ill. App. 3d at 55, 653 N.E.2d at 984.    

In this instance, by including sections 25(c)(1) and 35(b) in the Act, the legislature clearly expressed its goal that defendants under the Act be represented by counsel and afforded certain constitutional protections (725 ILCS 207/25(c)(1), 35(b) (West 1998)).  Those expressed goals would be hollow if defendants under the Act were entitled to counsel but not to the effective assistance of that counsel.  We therefore conclude that the right to counsel under the Act includes the right to the effective assistance of counsel.  

In so concluding, we reject the State's contention that because the right to counsel under the Act is statutory, defendants under the Act are not entitled to effective assistance of counsel, but only to "reasonable assistance" of counsel.  In support of its contention, the State relies on 
People v. Owens
, 139 Ill. 2d 351, 364-65, 564 N.E.2d 1184, 1189-90 (1990), in which the Supreme Court of Illinois held that defendants proceeding under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1987, ch. 38, par. 122-1 
et
 
seq
. (now 725 ILCS 5/122-1 
et
 
seq
. (West 1998))) are entitled to reasonable assistance of counsel and explained, in pertinent part, as follows:

"Because the right to counsel in post-conviction proceedings is derived from a statute rather than the Constitution, post-conviction petitioners are guaranteed only the level of assistance which that statute provides.  Section 122-4 of the Code of Criminal Procedure and Supreme Court Rule 651 provide post[]conviction petitioners with a 
reasonable
 level of assistance in post[]con­viction proceedings, but do not guarantee that they will receive the same level of assistance that the Constitution guarantees to defendants at trial.  This distinction is rational, because trial counsel plays a different role than counsel in post[]conviction proceedings.  [Citation.]  At trial, counsel acts as a shield to protect defendants from being 'haled into court' by the State and stripped of their presumption of innocence.  (
Ross v. Moffitt
 (1974), 417 U.S. 600, 610-11, 41 L. Ed. 2d 341, 351, 94 S. Ct. 2437, 2444.)  Post[]conviction petitioners, however, have already been stripped of the presumption of innocence, and have generally failed to obtain relief on appellate review of their convictions.  It is the petitioner, rather than the State, who initiates the post[]con­viction proceeding, by claiming that constitutional violations occurred at his trial.  Counsel are appointed to represent post[]conviction petitioners, not to protect them from the prosecutorial forces of the State, but to shape their complaints into the proper legal form and present those complaints to the court."  

As the above excerpt illustrates, the court in 
Owens
 did not hold that whenever a right to counsel arises by statute, the right conferred is only the right to reasonable assistance of counsel.  Instead, the court's holding was based on the nature of proceedings under the Post-Conviction Hearing Act and, thus, is specific to it.  

Proceedings under the Act, on the other hand, more closely resemble criminal prosecutions than postconviction proceedings.  Proceedings under the Act are initiated by the State and, as in criminal proceedings, a defendant's counsel serves as a shield to protect defendant from the "prosecutorial forces" of the State.  Moreover, in contrast to the Act, the Post-Conviction Hearing Act does not contain a provision providing that defendants in proceedings under that Act are entitled to "all constitutional rights available to a defendant in a criminal proceeding."  725 ILCS 207/35(b) (West 1998).

Having concluded that defendants under the Act are entitled to effective assistance of counsel, we hereby adopt the 
Strickland
 standard for measuring counsel's effectiveness under the Act.  The 
Strickland
 standard "provides a reasonable and workable standard for reviewing claims of ineffective assistance of counsel."  
Carmody
, 274 Ill. App. 3d at 55, 653 N.E.2d at 984.  Moreover, the 
Strickland
 standard is well understood, and a body of case law applying that standard already exists.  

Reversal under 
Strickland
 requires a defendant to prove that (1) his counsel's conduct fell below an objective standard of reasonableness (
Strickland
, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064) and (2) the deficient performance prejudiced the defendant such that a "reasonable probability" exists that the result would have been different but for the deficient performance (
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068).  If it is easier to dispose of a claim for lack of sufficient prejudice accruing to the defendant, that course should be taken.  
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; see 
People v. Albanese
, 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246, 1255-56 (1984) (adopting 
Strickland
 standard in Illinois).

[The following material is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).]

Nonpublishable material omitted here. 

[The preceding material is nonpublishable under Supreme Court Rule 23.]

III. EPILOGUE

Because of the page limitations imposed under the ad-ministrative order entered June 27, 1994, in relation to revised Supreme Court Rule 23 (166 Ill. 2d R. 23 at xix (administrative order)), we are compelled to delete (1) our analysis of defendant's ineffective assistance of counsel claim under 
Strickland
, and (2) our discussion of defendant's claim that the court abused its discretion by ordering him committed to a secure facility.  To briefly summarize for the benefit of the reader of the published decision, we held that defendant was not deprived of effective assistance of counsel by his counsel's (1) waiving of service of summons, (2) allowing defendant to admit the allegations of the State's petition in light of Davis' report, or (3) failing to introduce Davis' report as evidence at the dispositional hearing.  We further held that the trial court did not abuse its discretion by committing defendant to a secure facility.

A full, unabridged text of this decision is on file with the clerk of this court under docket No. 4-01-0231.

IV. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT and COOK, JJ., concur.