*In re* DETENTION OF JOHN M. ERBE (The People of the State of Illinois, Plaintiff-Appellee, v. John M. Erbe, Defendant-Appellant).

Fourth District   No. 4—02—0764

Argued June 25, 2003.—Opinion filed November 13, 2003.

MYERSCOUGH, P.J., dissenting.

David W. Butler (argued), of Bloomington, for appellant.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Lisa Anne Hoffman, Karen Kaplan, and Robert John Kane (argued), Assistant Attorneys General, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

Following a June 2002 bench trial, the trial court found defendant, John M. Erbe, to be a sexually violent person under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 through 99 (West 2000)). Following an August 2002 dispositional hearing, the court ordered him committed to the Department of Human Services (DHS) for institutional care in a secure facility.

Defendant appeals, arguing that (1) he received ineffective assistance of counsel when his initial appointed counsel (a) failed to challenge personal jurisdiction, and (b) moved to continue the probable-cause hearing; (2) the trial court abused its discretion by denying his motion for a *Frye* evidentiary hearing on the admissibility of evidence regarding actuarial instruments used by the State's experts in assessing defendant's risk of reoffending; (3) the court's finding that he was a sexually violent person was against the manifest weight of the evidence; and (4) the court abused its discretion by ordering him committed to institutional care in a secure facility. We affirm.

## I. BACKGROUND

On June 14, 2000, the State filed a petition under the Act, seeking to have defendant committed as a sexually violent person to DHS indefinitely. At that time, defendant was an inmate at the Centralia Correctional Center and was scheduled for entry into mandatory supervised release on June 20, 2000, following the completion of his sentence on 1988 convictions for home invasion (Ill. Rev. Stat. 1987, ch. 38, par. 12—11) and aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(1)). On that same day, the trial court entered an order of detention in which the court (1) set a probable-cause hearing for June 19, 2000; and (2) appointed McLean County public defender Amy Davis to represent defendant.

On June 16, 2000, Davis filed a motion to continue the probable-cause hearing because she needed additional time to review the materials the State had filed with its petition. Davis then telephoned the trial court's secretary and indicated that she and the assistant Attorney General had agreed that the probable-cause hearing should be continued. The court informed counsel that it would reschedule that hearing if both parties agreed and requested that the attorneys agree upon a new hearing date. The assistant Attorney General later telephoned the court's secretary and indicated that the parties had agreed to reschedule the probable-cause hearing for June 26, 2000.

At the June 26, 2000, probable-cause hearing, defendant appeared with his appointed counsel. After considering the evidence presented, the trial court found probable cause existed and ordered defendant transferred to DHS for an evaluation, pursuant to section 30(c) of the Act (725 ILCS 207/30(c) (West 2000)).

In July 2000, defendant *pro se* filed a motion to dismiss the State's petition, alleging, *inter alia*, that (1) his probable-cause hearing was not held within 72 hours of the filing of the State's petition, as required by statute (725 ILCS 207/30(b) (West 2000)); and (2) he was not "properly served with process." That same day, defendant *pro se*

filed a motion, seeking appointment of counsel other than a McLean County public defender on the ground that Davis moved to continue the probable-cause hearing without his consent.

At a July 2000 hearing on defendant's motion seeking appointment of other counsel, Davis informed the trial court that she requested a continuance (1) because she had other matters to which she had to attend when she received the State's petition; and (2) in "an effort for [her] to be prepared for [the probable-cause] hearing." She acknowledged that because her office usually receives the State's petitions under the Act "pretty much at the last minute," she routinely seeks to continue probable-cause hearings to allow time to carefully review the petitions. After considering the arguments, the trial court denied defendant's motion.

In January 2001, defendant filed a motion for a *Frye* evidentiary hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) to determine the admissibility of evidence regarding actuarial risk-assessment instruments used by the State's experts in assessing defendant's risk of reoffending. In February 2001, the trial court conducted a hearing on defendant's motion and took the matter under advisement. Later that month, the court denied the motion, upon finding that (1) the actuarial risk- assessment instruments did not constitute scientific evidence subject to the *Frye* standard; and (2) even if the instruments were subject to the *Frye* standard, they had been generally accepted in the relevant scientific community.

From February 2001 through May 2002, the trial court granted several continuances. Also during that time, defendant *pro se* filed a petition for a writ of *habeas corpus* in which he raised some of the same issues raised in his July 2000 *pro se* motion to dismiss. In November 2001, the court dismissed defendant's petition for a writ of *habeas corpus*, and in May 2002, this court dismissed defendant's appeal from the November 2001 order.

In June 2002, the trial court conducted a hearing on defendant's *pro se* July 2000 motion to dismiss the State's petition. At that hearing, defendant was represented by a different appointed counsel, who adopted and argued defendant's motion. Although defendant's motion contained numerous allegations, defendant addressed only two allegations at the hearing—namely, that (1) his probable-cause hearing was not held within 72 hours of the filing of the State's petition, as required by statute (725 ILCS 207/30(b) (West 2000)); and (2) the trial court lacked jurisdiction because he was not "properly served with process." Defendant testified that he received the State's June 14, 2000, petition and the order of detention, which indicated that (1) the court had appointed a McLean County public defender to represent

him; and (2) the probable-cause hearing was scheduled for June 19, 2000. However, he was not served with summons. He later learned that his probable-cause hearing was rescheduled for June 26, 2000. Defendant appeared at the June 26, 2000, probable-cause hearing, where he was represented by Davis. At that hearing, he attempted to tell the court that he had not been served with summons and had not asked for a continuance, but the court did not give him permission to speak. Defendant stated that he did not authorize Davis to file a motion to continue his probable-cause hearing. After considering the evidence and counsel's arguments, the trial court denied defendant's motion to dismiss.

At defendant's June 2002 bench trial, Dr. Jacqueline Buck, a clinical psychologist and special evaluator for the Illinois Department of Corrections (DOC), testified that she had reviewed defendant's DOC master file, which contained all of the court records related to defendant, including the written judgment of sentence, the presentence investigation reports, psychiatric and psychological evaluations, DOC records, and his criminal history.

Buck's review of defendant's master file showed that when defendant was 11 years old and living in California, he began engaging in criminal activity, including grand theft auto and shoplifting. He also began running away, fighting at school, and on one occasion, he attacked a teacher. When he was 13 years old, he was expelled from school after raping a 12-year-old girl. Around that time, defendant's mother moved from California to McLean County, Illinois. Defendant stayed in California and lived either on the streets or with one of his former stepfathers. In 1974, defendant was declared an "incorrigible juvenile" and was placed in juvenile hall and, later, several group homes. Defendant admitted raping a young girl during that time.

Later in 1974, when defendant was 15 years old, he moved to McLean County to live with his mother. He had been in McLean County for only three days when police arrested him for rape. They later released him to his mother. In 1975, defendant committed numerous offenses, including deviate sexual assault, armed robbery, home invasion, aggravated criminal sexual assault, and rape. In the rape case, he entered a woman's apartment, held a knife to her throat, and threatened to kill her. He raped her three times and forced her to perform oral sex on him. He then tied her up and left the apartment. A baby was in the room during the rape. (Buck acknowledged that in her report, she had mistakenly indicated that defendant had held a knife to the baby's throat.) Later in 1975, while incarcerated at the McLean County juvenile detention center, he sexually assaulted a male inmate and was charged with deviate sexual assault.

Based on some of defendant's 1975 offenses, the State filed a petition seeking to have defendant declared a sexually dangerous person. He was later found to be sexually dangerous based on the 1975 rape offense. Defendant was initially sent to DOC's youth division, where he participated in treatment for a few months. A jury later convicted him as an adult for the 1975 rape (McLean County case No. 75—CF—483), and the trial court sentenced him to 4 to 10 years in prison. Defendant was paroled in 1980.

In 1981, defendant was charged with rape, home invasion, and (attempt) burglary (McLean County case No. 81—CF—430). During this incident, he entered a woman's apartment, tied up the victim, and placed a sock in her mouth. He then removed the sock and tried to place his penis in her mouth. Defendant left after the victim convinced him that other people were in the apartment. A jury later convicted defendant of (attempt) burglary, and the trial court sentenced him to three years in prison.

Sometime following his 1983 parole in McLean County case No. 81—CF—430, defendant pleaded guilty to unlawful use of a weapon by a felon and was sentenced to five years in prison. In that case, defendant, armed with a gun, entered a woman's apartment. When the woman saw him, she ran from the apartment.

In 1988, defendant was convicted of aggravated criminal sexual assault and home invasion (McLean County case No. 88—CF—148), and the trial court sentenced him to 25 years in prison. In that case, he entered the apartment of three young women and forced one of the victims to have sex with him at knifepoint. He also dragged the knife across the victim's throat, stomach, and breasts and threatened to kill her. Defendant then tied up the victim and turned to a second victim, who fought him and screamed. Defendant ran from the apartment naked after the first victim freed herself and the third roommate woke up and telephoned police.

Defendant's master file also showed that he began using drugs when he was 11 years old. Over the next five years, he used marijuana, cocaine, heroin, and amphetamines. During that time, he was diagnosed with polysubstance dependency. Several of defendant's criminal offenses involved alcohol or other drugs.

Defendant's master file further showed that defendant admitted committing 11 or 12 rapes for which he was never apprehended. He blamed most of those rapes on his then-wife (to whom he was married from 1980 until 1988) because she would not engage in certain sexual activities. During his incarcerations, defendant had not participated in any sex-offender treatment.

Buck attempted to interview defendant in April 2000; however, he

refused to participate. Although Buck preferred to conduct clinical interviews, such an interview was not necessary to formulate opinions regarding defendant.

Based on her review of defendant's master file and other information, Buck diagnosed defendant with sexual sadism and severe antisocial personality disorder. Three criteria exist for the diagnosis of sexual sadism, and defendant satisfied all three. Seven criteria exist for the diagnosis of antisocial personality disorder, and the presence of any three warrant the diagnosis. Defendant satisfied six of the seven criteria. Buck described antisocial personality disorder as "a violation of and disregard for the rights of others." Sexual sadism and antisocial personality disorder are the types of mental disorders that affect a person's emotional capacity and predispose a person to engage in future acts of sexual violence.

Buck also diagnosed defendant with "poly drug dependency without physiological dependency in a controlled environment," based on his long history of substance abuse. Buck explained that substance abuse was a factor in determining defendant's probability of reoffending. Defendant had not participated in any substance abuse treatment.

In assessing defendant's probability of reoffending, Buck used three actuarial risk-assessment instruments, all of which were the subject of defendant's January 2001 motion for a *Frye* evidentiary hearing: (1) the Minnesota Sex Offender Screening Tool-Revised (Minnesota Screening Tool-Revised); (2) the Static-99; and (3) the Violence Risk Appraisal Guide. She also administered a personality inventory (the Hare Psychopathy Checklist-Revised) in evaluating defendant. Buck had received about 150 hours of specialized training geared to the proceedings under the Act, including the administration of actuarial risk- assessment instruments and other evaluation tools. Defendant's scores on the three actuarial risk-assessment instruments placed him in "membership with a group of sex offenders who did sexually reoffend at a fairly high rate."

Buck described the Hare Psychopathy Checklist-Revised as a 20-item personality inventory. An individual who scores 30 or more on the Hare Psychopathy Checklist-Revised is classified as a psychopath. Those individuals "are two to four times as likely to reoffend with acts of violence when released to the community, as someone who scores lower than 25." A score of 30 is a "conservative" cutoff, and many researchers use a score of 25 as a cutoff for psychopathy. Out of the 20 items on the Hare Psychopathy Checklist-Revised, Buck was able to score 18 in testing defendant. The remaining two items she marked as omissions because she did not have enough data. The inventory was

designed to allow for omitted items to be scored. Before factoring in the two omissions, defendant's raw score totaled 29. After factoring in the omissions, his raw score totaled 32.2. Buck acknowledged that she used some of the same scoring factors on two different items of the Hare Psychopathy Checklist-Revised. She stated that such use of scoring factors involved "a different way of looking at the behavior." Buck also acknowledged that she scored defendant as having a "flat affect" (meaning that he did not show emotion) based on five minutes of interaction.

Based on (1) Buck's review of (a) defendant's master file, (b) the results of the Minnesota Screening Tool-Revised, the Static-99, and the Violence Risk Appraisal Guide, (c) defendant's score on the Hare Psychopathy Checklist-Revised, and (d) defendant's mental disorder diagnoses; and (2) Buck's clinical judgment, Buck opined that it was "substantially probable" that defendant would sexually reoffend with acts of violence if he were released into the community. She also opined that defendant was at a higher risk of reoffending than the general prison population. Buck further opined that defendant had serious difficulty in controlling his behavior outside of a controlled environment.

Buck acknowledged that (1) defendant's sex offenses occurred while he was in his teens and twenties; (2) he had been incarcerated since then; and (3) his behavior in prison over the last several years had been "pretty good." Buck also acknowledged that defendant's failure to participate in sex-offender treatment did not increase his risk of reoffending. She further acknowledged that Carl Hanson, an authority in the field of sex- offender risk assessment, had stated in an article that the Violence Risk Appraisal Guide is a good predictor of general violence, but it has not been "particularly effective" in predicting sex-offense reoffending. Buck described Hanson's comment as a vague "cheap shot."

Barry Leavitt, a clinical psychologist and special evaluator for DHS, testified that he reviewed defendant's DOC master file and Buck's report. In July 2000, he approached defendant to initiate a psychological evaluation, and defendant agreed to participate in psychological testing. Leavitt administered the following tests to defendant: (1) a general aptitude measure for adults, which provides a baseline for an individual's intellectual functioning; (2) the Millon Multiaxial Personality Inventory Assessment (Millon Assessment); and (3) the Minnesota Multiphasic Personality Inventory (Minnesota Inventory). The Millon Assessment and the Minnesota Inventory provide information regarding an individual's overall personality functioning. Defendant's score on the general aptitude measure for adults was in the "low average range."

When Leavitt approached defendant in August 2000 to conduct a clinical interview, defendant refused to participate. Leavitt stated that the preferred method for evaluating an individual involves a clinical interview. However, Leavitt was able to formulate an opinion regarding defendant based on other available information.

Leavitt identified several "static" (unchanging) factors associated with an increased risk of reoffending, which defendant displayed. Those risk factors included the following: (1) refusal to participate in sex-offender treatment; (2) deviate sexual preferences; (3) multiple prior sex offenses; (4) offenses other than sex offenses; (5) early onset of sexually violent interests and behavior; (6) unrelated victims; (7) lack of motivation for treatment; (8) resistance to change; (9) anger problems; (10) low level of remorse; and (11) antisocial lifestyle.

Based on his review of all available information, Leavitt diagnosed defendant with (1) sexual sadism; (2) polysubstance dependence without physiological dependence within a controlled environment; and (3) severe antisocial personality disorder. Sexual sadism and antisocial personality disorder are the types of mental disorders that affect a person's emotional capacity and predispose a person to engage in future acts of sexual violence.

Leavitt used two actuarial risk-assessment instruments in evaluating defendant: (1) the Minnesota Screening Tool-Revised; and (2) the Static-99. The results of those actuarial risk-assessment instruments placed defendant in the category of highest risk of committing future acts of sexual violence. (As earlier stated, both of these instruments were challenged in defendant's January 2001 motion for a *Frye* evidentiary hearing.)

Based on the available information, Leavitt opined that defendant "possesses an exceedingly high and substantial probability of re[ ]offending at some time in the future." He also opined that defendant had serious difficulty controlling his sexually violent behavior.

Defendant did not present any evidence on his own behalf.

Based on the evidence presented, the trial court found that defendant was a sexually violent person.

At defendant's August 2002 dispositional hearing, Leavitt testified that he conducted a separate evaluation to identify defendant's treatment needs and the least-restrictive setting available to meet those needs. In forming his opinions, Leavitt reviewed the following sources of information: (1) defendant's past participation in sex-offender treatment; (2) defendant's motivation to participate in sex-offender treatment; (3) defendant's sex-offense history; (4) defendant's mental-health status; and (5) relevant risk factors.

Based on his review of all available information, Leavitt opined

that (1) defendant's mental-health status had not changed; (2) defendant was not motivated to seek sex-offender treatment; and (3) defendant remained at an "exceedingly high risk" of reoffending in a sexually violent manner. He also opined that defendant needed to be placed in a secure-care treatment setting. Leavitt explained that opinion as follows:

"[A]t the present time[,] [defendant] presents at an exceedingly high level of risk for reoffending, needs the structure and supervision and intensity and comprehensiveness of treatment that would be available in a secure[-]care treatment setting."

Leavitt acknowledged that in his predispositional report, he mentioned a 1975 incident in which defendant allegedly held a knife to a baby's throat. That alleged incident suggested the level of violence to which defendant would resort to carry out his sexually violent behavior. However, Leavitt did not consider that alleged incident as significant in forming his opinions. (The record shows that it was defendant's brother who held a knife to a baby's throat in that incident, not defendant.) Leavitt also acknowledged that in forming his opinion regarding the best treatment option, he had considered the fact that no evidence existed that defendant had a proper support system. However, even if defendant had an active social-support network, that fact would not alter his opinion that defendant needed to be in a secure treatment setting. Leavitt further acknowledged that he had not interviewed defendant prior to completing his predispositional report. He explained that (1) defendant had refused to participate in an August 2000 clinical interview; and (2) when he conducted his predispositional evaluation of defendant, he believed he had an abundance of information, which did not require him to again attempt to interview defendant.

Hollida Wakefield, a psychologist who primarily focused her practice on sex offenders, testified on defendant's behalf that she evaluated defendant twice—once to assess whether he was a sexually violent person and a second time to prepare a predispositional report. Based on her initial evaluation, Wakefield diagnosed defendant with (1) sexual sadism; (2) polysubstance dependence without physiological dependence within a controlled environment; and (3) antisocial personality disorder.

During her second evaluation, Wakefield conducted a clinical interview of defendant, which indicated as follows. Defendant was "unusually candid," took responsibility for his sex offenses, and expressed remorse. Defendant's motivation for sex-offender treatment in the "Joliet program" is "quite low" because he does not trust the treatment staff. (The record shows that the DHS secure-care treat-

ment setting is located in Joliet.) Defendant's mother had expressed a desire to help him if he were released to the community, and his sister lived in Illinois and visited him. Because defendant's sexual sadism was not the severe type, he was "amenable to treatment."

Wakefield also administered the Hare Psychopathy Checklist-Revised in evaluating defendant. Defendant's score on that personality inventory totaled 25. Based on that score, Wakefield opined that defendant was not a psychopath. Following the trial court's February 2001 denial of defendant's motion for a *Frye* evidentiary hearing, defendant introduced Wakefield's testimony regarding several actuarial risk-assessment instruments, including the Minnesota Screening Tool-Revised, the Static-99, and the Violence Risk Appraisal Guide. Based on her administration of those instruments, Wakefield determined that defendant was at a high risk of reoffending.

Wakefield opined that the most appropriate and least-restrictive alternative treatment option for defendant was outpatient treatment with appropriate safeguards. She based her opinion on the following factors: (1) defendant was no longer a disciplinary problem in prison; (2) his sex offenses were planned, which suggested that he could "be managed better than a person whose offenses are impulsive"; (3) defendant was able to identify general situations that placed him at risk of reoffending; (4) defendant was motivated to not return to prison; and (5) defendant's family support system.

Wakefield acknowledged that she was not aware of any specific sex-offender treatment programs that met her suggested parameters for defendant. She also acknowledged that defendant's diagnosis of antisocial personality disorder meant that he was more likely to act impulsively and irresponsibly. She explained that although defendant's behavior had "greatly improved" over the last few years, "you don't really know until he is out" how he will behave. Wakefield further acknowledged that defendant had never participated in sex-offender or substance-abuse treatment.

Denise Marshall, defendant's sister, testified that if defendant were released, she would provide support for him. Defendant had expressed remorse and shame regarding his sex offenses. Based on her conversations with defendant, she believed that he would participate in sex-offender or substance-abuse treatment.

Based on the evidence presented, the trial court ordered defendant committed to DHS for institutional care in a secure facility. This appeal followed.

## II. ANALYSIS

### A. Defendant's Ineffective-Assistance-of-Counsel Claim

Defendant first argues that he received ineffective assistance of

counsel when Davis, his initial appointed counsel, (1) failed to appear at the June 19, 2000, probable-cause hearing and challenge personal jurisdiction based on the State's failure to serve him with summons, and (2) moved to continue the probable-cause hearing. We disagree.

■ In *People v. Rainey*, 325 Ill. App. 3d 573, 586, 758 N.E.2d 492, 502-03 (2001), this court held that defendants under the Act are entitled to effective assistance of counsel measured by the *Strickland* standard (see *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)). To establish ineffective assistance of counsel, a defendant must first demonstrate that his counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the [s]ixth [a]mendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. In so doing, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. As the *Strickland* Court stated:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Second, a defendant must demonstrate a reasonable probability that, but for defense counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Both prongs of the *Strickland* test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. *People v. Coleman*, 183 Ill. 2d 366, 397, 701 N.E.2d 1063, 1079 (1998).

### 1. *Counsel's Failure To Challenge Personal Jurisdiction*

■ Defendant first contends that he received ineffective assistance of counsel when Davis failed to appear at the June 19, 2000, probable-cause hearing and challenge personal jurisdiction based on the State's failure to serve him with summons. We disagree.

Even if Davis had appeared at the June 19, 2000, probable-cause hearing, objected to personal jurisdiction, and insisted on service of

summons, it is not reasonably probable that the result of the probable-cause hearing would have been different. Had Davis insisted on proper service of summons, the trial court could have directed that technical service be then complied with in open court, and ordered that the preliminary hearing be held that same day, which still would have been within the 72-hour requirement of section 30(b) of the Act. See 725 ILCS 207/30(b) (West 2000). Thus, Davis may reasonably have concluded that appearing at the June 19, 2000, probable-cause hearing and objecting to personal jurisdiction would have gained her client nothing. See *People v. Ivy*, 313 Ill. App. 3d 1011, 1018, 730 N.E.2d 628, 636 (2000) (counsel is not required to perform a futile act to avoid charges of ineffective assistance of counsel).

## 2. *Counsel's Motion To Continue*

■ Defendant also contends that he received ineffective assistance of counsel when Davis moved to continue the June 19, 2000, probable-cause hearing. Specifically, he asserts that Davis's doing so was not a strategic decision because she sought continuances in all proceedings under the Act. We disagree.

At the July 2000 hearing on defendant's motion seeking appointment of other counsel, Davis acknowledged that because her office usually receives the State's petitions under the Act "pretty much at the last minute," she routinely seeks to continue probable-cause hearings to allow time to carefully review the petitions. However, she also addressed the reasons she sought a continuance in this particular case—namely, (1) because she had other matters to which she had to attend when she received the State's petition; and (2) in "an effort for [her] to be prepared for [the probable-cause] hearing."

Under these circumstances, we conclude that defendant has failed to overcome the strong presumption that the challenged action of counsel was the product of sound trial strategy and not of incompetence.

## 3. *Defendant's Embedded Arguments*

Although not set forth in a separate argument section, defendant contends that (1) the trial court's June 14, 2000, appointment of counsel is "arguably void" because "it was entered at a time when the court did not have jurisdiction" over defendant; and (2) he was denied due process and his statutory right to be present at all hearings when the trial court conducted an "informal hearing" on Davis's motion to continue the probable-cause hearing. We disagree.

■ The trial court's June 14, 2000, appointment of counsel is not "arguably void" because "it was entered at a time when the court did not have jurisdiction" over defendant, based on the State's failure to

serve him with summons. When defendant appeared and participated at the June 26, 2000, probable-cause hearing, he waived objection to the court's personal jurisdiction over him. See *Rainey*, 325 Ill. App. 3d at 581, 758 N.E.2d at 499 (defendant under the Act submitted to the trial court's jurisdiction when he appeared and participated at his probable-cause hearing).

■ Nor do we agree with defendant that the trial court conducted an "informal hearing" on Davis's motion to continue the probable-cause hearing. We are simply not persuaded that the two telephone calls from Davis and the assistant Attorney General, respectively, regarding the status of Davis's motion to continue, constituted a "hearing" at which defendant had the right to be present, pursuant to the Act. See 725 ILCS 207/25(c) (West 2000).

### B. The Trial Court's Denial of Defendant's Motion for a *Frye* Hearing

Defendant also argues that the trial court erred by denying his motion for a *Frye* evidentiary hearing to determine the admissibility of evidence regarding the actuarial instruments used by Buck and Leavitt in assessing defendant's risk of reoffending. We disagree.

### 1. *Applicability of the Frye Standard to Actuarial Risk-Assessment Instruments*

#### a. Scientific Principle, Method, or Test

■ Initially, we hold that the actuarial risk-assessment instruments used in this case do not purport to involve a scientific principle, method, or test to which *Frye* applies. See *Frye*, 293 F. at 1014 (standard applies to deductions from a purportedly scientific principle, technique, or test). "Rather, they are simply actuarial tables—methods of organizing and interpreting a collection of historical data." *In re Commitment of R.S.*, 339 N.J. Super. 507, 540, 773 A.2d 72, 92 (2001), *aff'd*, 173 N.J. 134, 801 A.2d 219 (2002). Actuarial risk-assessment instruments, like those used in this case, were developed by observing those sex offenders who reoffend to determine which "risk factors" they have in common. See *In re Detention of Isbell*, 333 Ill. App. 3d 906, 911, 916, 777 N.E.2d 994, 997-98, 1002 (2002) (by observing what a large number of reoffenders have had in common, one can compile a list of risk factors). One can then calculate the relative frequency with which sex offenders with those risk factors have reoffended and thus assess the probability that other sex offenders with the same risk factors will reoffend. *Isbell*, 333 Ill. App. 3d at 916, 777 N.E.2d at 1002. The actuarial instruments merely help the professional draw inferences from historical data or the collective experience of other profes-

sionals who have assessed sex offenders for risks of reoffending. In this regard, the instruments are akin to actuarial tables for life expectancy admitted as evidence to a jury for the determination of the gross amount awarded for future pain and suffering or used by an economic expert to determine the present cash value of a pension. Such instruments simply do not constitute a special scientific principle, method, or test to which *Frye* applies.

We find support for our holding in the Supreme Court of Washington's decision in *State v. Russell*, 125 Wash. 2d 24, 882 P.2d 747 (1994). In that case, the defendant had posed the bodies of his three murder victims (by placing a pinecone in each victim's hand and a book under each victim's arm, among other things). *Russell*, 125 Wash. 2d at 30-35, 882 P.2d at 756-58. To prove that the murderer of the three victims was probably the same person, the State's experts analyzed two computer databases consisting of "forms, filled out by local law enforcement officers, listing the various characteristics of homicides in Washington and the nation." *Russell*, 125 Wash. 2d at 69, 882 P.2d at 776. On the basis of that analysis, the experts testified to "the rarity of posed murder victims." *Russell*, 125 Wash. 2d at 69, 882 P.2d at 776. The defendant argued that the testimony was inadmissible under *Frye* because the experts "improperly relied on unproven scientific methodologies in determining that the same person committed all three murders." *Russell*, 125 Wash. 2d at 68, 882 P.2d at 776. The Supreme Court of Washington disagreed, holding that *Frye* was "clearly *** inapplicable" because the computer programs were "nothing more than sophisticated record-keeping systems." *Russell*, 125 Wash. 2d at 70, 882 P.2d at 776. Like the experts in *Russell*, Buck and Leavitt essentially drew an inference of probability from a sophisticated record-keeping system.

## b. Novelty

Even assuming that the sort of actuarial instruments used by Buck and Leavitt involve a scientific principle, method, or test (see *People v. Taylor*, 335 Ill. App. 3d 965, 977, 782 N.E.2d 920, 930 (2002) (holding that such actuarial instruments constitute a scientific methodology), *appeal denied*, 206 Ill. 2d 641 (2003); see also *In re Detention of Traynoff*, 338 Ill. App. 3d 949, 964, 789 N.E.2d 865, 878 (2003) (same holding, reaffirming *Taylor*); *In re Detention of Hargett*, 338 Ill. App. 3d 669, 675, 786 N.E.2d 557, 562 (2003) (same holding, relying on *Taylor*)), those instruments do not involve the kind of "new" or "novel" scientific principle, method, or technique to which *Frye* applies. See *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 78-79, 767 N.E.2d 314, 324-25 (2002) ("The trial judge ap-

plies the *Frye* test only if the scientific principle, technique[,] or test offered by the expert to support his or her conclusion is 'new' or 'novel' "; noting that "a scientific technique is 'new' or 'novel' if it is 'original or striking' or does 'not resembl[e] something formerly known or used.' [Citation.]"); Websters Third New International Dictionary 1546 (1981) (defining "novel" as "original or striking in conception or style"); see also *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 779, 776 N.E.2d 262, 281 (2002) (the process of recording and downloading data from automobile crash sensors did not constitute a novel technique or method). Our society uses actuarial methods to predict human behavior all the time (for example, in liability insurance and economics). In addition, actuarial instruments similar to the ones used in this case have long been used in predicting recidivism by released prisoners. See D. Faigman, D. Kaye, M. Saks & J. Sanders, Modern Scientific Evidence: The Law and Science of Expert Testimony § 9—2.1 (2d ed. 1997). For example, in 1928, the Illinois State Board of Parole published the results of what was apparently the first attempt to predict recidivism through actuarial data. See W. Grove & P. Meehl, *Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal (Mechanical, Algorithmic) Prediction Procedures: The Clinical-Statistical Controversy*, 2 Psych. Pub. Pol. & L. 293, 293 (1996). Further, the United States Parole Commission has used an actuarial risk-assessment instrument (the Salient Factor Score) since 1972 to predict recidivism and guide parole decisions. See P. Hoffman, *Twenty Years of Operational Use of a Risk Prediction Instrument: The United States Parole Commission's Salient Factor Score*, 22 J. Crim. Just. 477, 477-78 (1994).

Further, such actuarial instruments do not concern a novel scientific principle, method, or test that may instill a sense of "false confidence" or carry a misleading sense of scientific "infallibility." See *Donaldson*, 199 Ill. 2d at 86-87, 767 N.E.2d at 329 (observing that the method of extrapolation does not involve a technique new to science that may instill a sense of false confidence because "extrapolation by nature admits its fallibility—the lack of specific support to establish the existence of a known cause and effect relationship"). In this regard, we agree with the Court of Appeals of Arizona, which held that the *Frye* standard did not apply to "the use of actuarial models by mental[-]health experts to help predict a person's likelihood of recidivism" (*State ex rel. Romley v. Fields*, 201 Ariz. 321, 328, 35 P.3d 82, 89 (2001)) stating, in pertinent part, as follows:

> "Unlike DNA and other types of 'scientific' evidence, these risk[-] assessment tools do not have an aura of scientific infallibility. \*\*\* [T]hey are subject to interpretation and their predictive value is far less than 100%." *Fields*, 201 Ariz. at 328, 35 P.3d at 89.

## 2. General Acceptance of Actuarial Risk-Assessment Instruments

Even assuming that the *Frye* standard applies, we agree with the trial court that the use of actuarial risk-assessment instruments is generally accepted by professionals who assess sex offenders for risk of reoffending.

In *Donaldson*, 199 Ill. 2d at 76-78, 767 N.E.2d at 323-24, the supreme court discussed the admission of expert testimony under the *Frye* standard, stating as follows:

"Illinois law is unequivocal: the exclusive test for the admission of expert testimony is governed by the standard first expressed in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). [Citations.] The *Frye* standard, commonly called the 'general acceptance' test, dictates that scientific evidence is only admissible at trial if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' *Frye*, 293 F. at 1014.

First, 'general acceptance' does not concern the ultimate conclusion. Rather, the proper focus of the general acceptance test is on the underlying methodology used to generate the conclusion. If the underlying methods used to generate an expert's opinion are reasonably relied upon by the experts in the field, the fact finder may consider the opinion—despite the novelty of the conclusion rendered by the expert. [Citations.]

Second, general acceptance of methodologies does not mean 'universal' acceptance of methodologies. *** 'In determining whether a novel scientific procedure is "generally accepted" in the scientific community, the issue is consensus versus controversy over a particular technique. *** Moreover, the mere existence of a dispute does not preclude a finding that the procedure is generally accepted.' [Citations; see] *Frye*, 293 F. at 1014 ('[J]ust when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized'). Simply stated, general acceptance does not require that the methodology be accepted by unanimity, consensus, or even a majority of experts. A technique, however, is not 'generally accepted' if it is experimental or of dubious validity."

We review *Frye* issues under an abuse of discretion standard. *Donaldson*, 199 Ill. 2d at 76, 767 N.E.2d at 323. "In determining whether there has been an abuse of discretion, [a reviewing court] may not substitute [its] judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely." *Simmons v. Garces*, 198 Ill. 2d 541, 568, 763 N.E.2d 720, 737 (2002); see also *People v. Hall*, 195 Ill. 2d 1, 20, 743 N.E.2d 126, 138 (2000)

("An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court").

Although this court has affirmed a jury's finding that a defendant was a sexually violent person in a case in which the mental-health experts relied on an actuarial risk-assessment instrument to predict the defendant's risk of reoffending (see *In re Detention of Walker*, 314 Ill. App. 3d 282, 294, 731 N.E.2d 994, 1002 (2000)), this case presents this court with its first challenge to the admissibility of evidence regarding actuarial risk-assessment instruments in a sexually-violent-persons proceeding. However, other courts have addressed this issue, with virtually all holding that evidence regarding such actuarial instruments is admissible. Our research has shown only one reported decision in the United States that has barred the use of actuarial instruments to predict recidivism. See *Taylor*, 335 Ill. App. 3d at 979-80, 782 N.E.2d at 932 (in which the Second District recently held that certain actuarial instruments did not satisfy the *Frye* standard), *appeal denied*, 206 Ill. 2d 641 (2003). Having thoroughly examined all of those decisions, we find the decisions allowing evidence regarding such actuarial instruments to be more persuasive.

The New Jersey appellate court's decision in *R.S.*, 339 N.J. Super. 507, 773 A.2d 72, *aff'd*, 173 N.J. 134, 801 A.2d 219, represents one of the well-researched and well-reasoned decisions on the issue. The defendant in *R.S.* had been convicted of sex crimes against prepubescent boys. *R.S.*, 339 N.J. Super. at 513, 773 A.2d at 75. The State sought his commitment under the New Jersey Sexually Violent Predator Act (N.J. Stat. Ann. § 30:4—27.24 through 30:4—27.38 (West 2002)). *R.S.*, 339 N.J. Super. at 512, 773 A.2d at 74-75. At a five-day evidentiary hearing on the admissibility of actuarial instrument results, a State expert testified that she had administered four actuarial risk-assessment instruments, including the Minnesota Screening Tool-Revised and the Rapid Risk Assessment of Sex Offender Recidivism (Rapid Risk Assessment). *R.S.*, 339 N.J. Super. at 516, 773 A.2d at 77. Another State expert testified that a large number of research studies supported the use of actuarial instruments for determining the likelihood of recidivism. That psychologist explained that the original Minnesota Sex Offender Screening Tool was a clinically derived measure in which researchers took factors that research had shown as significant indicators for sexual recidivism and scored them, based on clinical judgment, to determine which were most significant. The researchers then refined the scale through factor analysis and validity studies to derive a more statistically valid approach, the Minnesota Screening Tool-Revised. The Minnesota Screen-

ing Tool-Revised had been validated and cross-validated with good results.

The State's expert further explained that the Rapid Risk Assessment was an empirically based instrument designed after a meta-analysis study by two prominent researchers in the field. (A meta-analysis study is one in which researchers look at several different studies at the same time and come up with a set of variables that are significant in all of them.) The Rapid Risk Assessment had been validated. The Static-99, which was the updated version of the Rapid Risk Assessment, was developed by a British researcher who combined the Rapid Risk Assessment with certain statistical instruments used in Britain and Canada. The Static-99 had been validated. The inter-rater reliability for the Minnesota Screening Tool-Revised, the Rapid Risk Assessment, and the Static-99 were all "fairly high," with the Static-99 the best. *R.S.*, 339 N.J. Super. at 520, 773 A.2d at 79.

The defendant's experts testified that the reliability of the instruments administered to the defendant was unknown. They also testified that (1) the Rapid Risk Assessment and the Minnesota Screening Tool-Revised had little to modest predictive value; and (2) the inter-rater reliability scores for the Minnesota Screening Tool-Revised were relatively acceptable. *R.S.*, 339 N.J. Super. at 524-28, 773 A.2d at 81-84.

On this evidence, the trial court in *R.S.* determined that evidence regarding the actuarial instruments was admissible under *Frye* (*R.S.*, 339 N.J. Super. at 530, 773 A.2d at 85), and the New Jersey appellate court affirmed the trial court's decision (*R.S.*, 173 N.J. 134, 801 A.2d 219). In so holding, the appellate court concluded that the State had met its burden of proving that the use of actuarial instruments was generally accepted by professionals who assess sex offenders for risks of reoffending. *R.S.*, 339 N.J. Super. at 540-41, 773 A.2d at 92. The appellate court also concluded that authoritative scientific and legal writings, along with the existence of numerous workshops held nationwide on the subject of risk assessment, established that actuarial instruments were "an accepted and advancing method of helping to assess the risk of recidivism among sex offenders." *R.S.*, 339 N.J. Super. at 545, 773 A.2d at 95.

In *In re Detention of Strauss*, 106 Wash. App. 1, 4, 20 P.3d 1022, 1023-24 (2001), the State filed a petition to have the defendant committed as a sexually violent person. In a pretrial motion, the defendant moved to exclude evidence regarding the results of certain actuarial risk-assessment instruments, including the Violence Risk Appraisal Guide and the Minnesota Screening Tool-Revised. After reviewing the parties' written arguments, the trial court denied the defendant's mo-

tion. *Strauss*, 106 Wash. App. at 4, 20 P.3d at 1024. The Washington appellate court affirmed the trial court's decision, upon concluding that the actuarial instruments were generally accepted within the relevant scientific community. The appellate court based its conclusion on (1) the expert testimony of both the State and the defendant; (2) the scientific literature; and (3) secondary legal authority. *Strauss*, 106 Wash. App. at 8, 20 P.3d at 1025.

■ Keeping in mind that "the *Frye* standard does not demand unanimity, consensus, or even a majority to satisfy the general acceptance test" (*Donaldson*, 199 Ill. 2d at 88, 767 N.E.2d at 330), we agree with *R.S.* and *Strauss* that the use of actuarial risk-assessment instruments is sufficiently established to have gained general acceptance by professionals who assess sex offenders for risks of reoffending. Accordingly, we hold that the trial court did not err by denying defendant's motion for a *Frye* hearing.

In so holding, we note that in addition to *R.S.* and *Strauss*, other appellate courts have accepted actuarial risk-assessment instruments in sexually-violent-persons proceedings. See *In re Commitment of Lalor*, 261 Wis. 2d 614, 623, 661 N.W.2d 898, 903 (App. 2003) (actuarial instruments used to assess the likelihood of reoffending were admissible in sexually-violent-person commitment proceeding, as instruments were commonly and reasonably relied upon by experts in the field of sex-offender risk assessment); *Jackson v. State*, 833 So. 2d 243, 246 (Fla. App. 2002) (concluding that the trial court did not err by determining that the actuarial instruments used in that case were "generally accepted in the relevant scientific community as part of the overall risk assessment for sexual predators"); *In re Detention of Holtz*, 653 N.W.2d 613, 619 (Iowa App. 2002) (in which the Iowa appellate court relied on *R.S.* in holding that the trial court properly admitted evidence regarding certain actuarial instruments, including the Static-99 and the Minnesota Screening Tool-Revised); *Garcetti v. Superior Court*, 85 Cal. App. 4th 508, 543, 102 Cal. Rptr. 2d 214, 238 (2000), *rev'd on other grounds sub nom. Cooley v. Superior Court*, 29 Cal. 4th 228, 57 P.3d 654, 127 Cal. Rptr. 2d 177 (2000) (psychiatrist's prediction of future dangerousness is not subject to *Frye*, regardless of whether the psychiatrist used clinical or actuarial models); *People v. Poe*, 74 Cal. App. 4th 826, 831-32, 88 Cal. Rptr. 2d 437, 440-41 (1999) (concluding that a Rapid Risk Assessment score in the high-risk category, adjusted with appropriate clinical factors, supported a finding that the defendant was likely to engage in sexually violent behavior if released); *In re Linehan*, 557 N.W.2d 171, 189 (Minn. App. 1996), *vacated on other grounds in Linehan v. Minnesota*, 522 U.S. 1011, 139 L. Ed. 2d 486, 118 S. Ct. 596 (1997) (in which the appellate court

rejected the defendant's argument that the State's expert improperly *failed to use* actuarial methods, upon concluding that the State's expert relied on base rate statistics; the appellate court also noted that enhanced accuracy can be achieved by combining actuarial methods with clinical judgment).

As earlier stated, our research has revealed only one reported decision in the United States concluding that actuarial risk-assessment instruments are inadmissible in sexually violent persons proceedings. In *Taylor*, 335 Ill. App. 3d at 967, 782 N.E.2d at 923, the trial court conducted a *Frye* evidentiary hearing on the admissibility of evidence regarding the Minnesota Screening Tool, the Minnesota Screening Tool-Revised, the Static-99, and the Rapid Risk Assessment. Following the *Frye* hearing, the trial court found that the actuarial instruments did not constitute scientific evidence subject to *Frye*, and even if they did, the instruments were generally accepted in the relevant scientific community. *Taylor*, 335 Ill. App. 3d at 972, 782 N.E.2d at 926. On appeal, the Second District reversed the trial court and concluded that the actuarial risk-assessment instruments "are still in the experimental stages" and their validity has not been established. *Taylor*, 335 Ill. App. 3d at 978, 782 N.E.2d at 931. The *Taylor* court based its conclusion, in large part, on the following: (1) the lack of significant peer review of the instruments; (2) the existence of "significant controversy" surrounding the instruments; and (3) the existence of "frequent scoring inconsistencies by different evaluators." *Taylor*, 335 Ill. App. 3d at 978, 782 N.E.2d at 931.

With respect to our colleagues in the Second District, we are not persuaded. Accepting *arguendo* the *Taylor* court's determination that significant peer review of the instruments does not exist, that factor alone should not render evidence regarding those instruments inadmissible under the *Frye* standard. See *People v. Kirk*, 289 Ill. App. 3d 326, 332, 681 N.E.2d 1073, 1077 (1997) (in which this court set forth what a court may consider in determining the admissibility of evidence under *Frye*: (1) scientific publications and law review articles; (2) prior court decisions in Illinois and other jurisdictions; (3) practical applications of the technique or method; and (4) testimony or affidavits of experts regarding (a) the acceptance of the technique or method within the relevant scientific community, and (b) the attitudes of their fellow scientists); see also 1 J. Strong, McCormick on Evidence § 203, at 726 (5th ed. 1999) (and cases cited therein).

Nor should the mere fact that the actuarial instruments are controversial render them inadmissible under *Frye*. Any approach to predicting human behavior will be controversial—and frequently criticized—because the task is so complex and daunting. Yet, the law

requires such predictions. If a psychiatrist or psychologist can predict a sex offender's likelihood of reoffending on the basis of a clinical examination, no logical reason exists why such a professional cannot at least consider actuarial instruments, which the profession widely uses and which are less subjective than unaided clinical judgment.

Last, the *Taylor* court's concern with "frequent scoring inconsistencies by different evaluators" goes to the expert's application of the actuarial instruments, not to their general acceptance. Questions concerning an expert's application of a technique go to the weight of the evidence rather than its admissibility. *Donaldson*, 199 Ill. 2d at 76-78, 767 N.E.2d at 323-24; see also *People v. Pope*, 284 Ill. App. 3d 695, 702, 672 N.E.2d 1321, 1326 (1996) (" ' "[a]ny question *concerning the specific procedures* used by the company or expert goes to the reliability of the evidence and is properly considered *by the jury* in determining what weight to give to this evidence" ' " (emphasis in original), quoting *People v. Johnson*, 262 Ill. App. 3d 565, 569, 634 N.E.2d 1285, 1288 (1994), quoting *People v. Lipscomb*, 215 Ill. App. 3d 413, 432, 574 N.E.2d 1345, 1357 (1991)); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 702.4, at 629 (7th ed. 1999) (questions raised with respect to the actual procedures employed to conduct the particular scientific process, technique, or test are properly considered by the trier of fact as going to the weight of the evidence).

As a final matter, we note that traditional methods, such as cross-examination and rebuttal witnesses, offered defendant the opportunity to challenge Buck's and Leavitt's opinions in the proper forum—that is, during trial in front of the trier of fact. As the Supreme Court stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 125 L. Ed. 2d 469, 484, 113 S. Ct. 2786, 2798 (1993), "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." See also *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 897, 647 N.E.2d 618, 627 (1995) (on cross-examination, counsel may probe the weaknesses in the bases of an expert's opinion as well as the general soundness of his opinion). The record shows that defendant conducted a vigorous cross-examination of both Buck and Leavitt.

## C. Sufficiency of the Evidence

Defendant next argues that the trial court's finding that he was a sexually violent person was against the manifest weight of the evidence. Specifically, he contends that reasonable doubt was created by (1) Buck's acknowledgment that in administering and scoring the Hare Psychopathy Checklist-Revised, (a) she added 3.2 points to

defendant's score because she lacked information on two of the scoring factors, (b) she used the same scoring factor on two different items, and (c) she scored defendant as having a flat affect based on five minutes of interaction; and (2) Leavitt's failure to base his opinion on a clinical interview of defendant. We disagree.

■ Section 5(f) of the Act defines a "sexually violent person" as an individual who has "been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2000). The State must prove the allegations of its petition beyond a reasonable doubt. 725 ILCS 207/35(d)(1) (West 2000). On review, we ask only whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt. *In re Detention of Tittlebach,* 324 Ill. App. 3d 6, 11, 754 N.E.2d 484, 488 (2001).

■ Defendant's claims regarding the alleged infirmities of Buck's and Leavitt's opinions simply attack the weight of the evidence and the credibility of those witnesses. In reviewing a challenge to the sufficiency of the evidence, it is not the function of this court to reweigh the evidence. "Rather, the trier of fact is charged with evaluating the credibility of the witnesses, resolving conflicts in the evidence, and deciding what reasonable inferences to draw from the evidence." *Tittlebach,* 324 Ill. App. 3d at 11, 754 N.E.2d at 488.

Moreover, Buck's opinion was not based solely on the Hare Psychopathy Checklist-Revised. Instead, her opinion was based on (1) a review of defendant's master file, which included prior mental-health evaluations by DOC personnel; (2) actuarial risk-assessment instruments; and (3) defendant's mental-disorder diagnoses.

Nor are we persuaded that Leavitt's failure to consider a clinical interview of defendant in forming his opinion (because defendant refused to be interviewed) raises reasonable doubt as to the verdict. Leavitt's opinion was based on (1) a review of defendant's master file, which included prior mental-health evaluations by DOC personnel; (2) actuarial risk-assessment tools; and (3) defendant's mental-disorder diagnoses. Clearly, a defendant's refusal to submit to a clinical interview by the State's expert cannot—by itself—raise reasonable doubt as to the trier of fact's verdict.

Reviewing the record before us in accordance with the appropriate standard of review, we conclude that any rational trier of fact could have found beyond a reasonable doubt that defendant was a sexually violent person.

## D. Commitment to a Secure Facility

Last, defendant argues that the trial court abused its discretion by committing him to institutional care in a secure facility. Specifically, he contends that the court's decision was based on Leavitt's opinion, which was of "questionable validity" because other evidence contradicted some of the factors upon which Leavitt relied in forming his opinion. We disagree.

■ Section 40(b)(2) of the Act directs the trial court to order that a person found to be a sexually violent person either be (1) committed to institutional care or (2) conditionally released. In making this determination, the court must consider (1) the nature and circumstances of the behavior that was the basis of the allegations in the State's petition; (2) the person's mental history and present mental condition; (3) where the person will live; (4) how the person will support himself; and (5) what arrangements are available to ensure that the person has access to, and will participate in, necessary treatment. See 725 ILCS 207/40(b)(2) (West 2000).

■ As in other cases where trial courts are called upon to weigh enumerated factors and evaluate evidence and witness credibility to reach a fair and just result, we will review the trial court's decision to commit defendant to a secure facility under an abuse of discretion standard. See *People v. Bell*, 313 Ill. App. 3d 280, 282, 729 N.E.2d 531, 534 (2000) ("The trial court is the proper forum to balance the mitigating and aggravating factors and make a reasoned decision as to the appropriate sentence"), *rev'd on other grounds*, 196 Ill. 2d 343, 751 N.E.2d 1143 (2001). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Hall*, 195 Ill. 2d at 20, 743 N.E.2d at 138.

•■ The record shows that the trial court was presented with evidence on all of the relevant factors, and the court's comments from the bench indicate that it considered all of those factors. In light of all of the evidence before the trial court, we conclude that its commitment order was not an abuse of discretion.

In so concluding, we note that defendant's challenges to Leavitt's testimony attack Leavitt's credibility and the weight of the evidence. However, as stated above, the duty of evaluating the evidence and witness credibility properly lies with the trial court, not this court. See *Simmons*, 198 Ill. 2d at 568, 763 N.E.2d at 737 ("In determining whether there has been an abuse of discretion, [a reviewing court] may not substitute [its] judgment for that of the trial court").

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

TURNER, J., concurs.

PRESIDING JUSTICE MYERSCOUGH, dissenting:

I respectfully dissent from the portion of the majority's opinion denying defendant's motion for a *Frye* evidentiary hearing to determine the admissibility of evidence on actuarial instruments used by Buck and Leavitt in assessing defendant's risk of reoffending.

I concurred in the opinion of *In re Detention of Bolton*, 343 Ill. App. 3d 1223 (2003), which held that "the psychological or psychiatric testimony of an expert predicated upon actuarial instruments is scientific evidence subject to *Frye.*" *Bolton*, 343 Ill. App. 3d at 1228. We concluded that "[t]here is a danger that actuarial instruments may intrude upon the proper functioning of the jury, that they may instill a false confidence or carry a misleading sense of scientific infallibility." *Bolton*, 343 Ill. App. 3d at 1228-29.

Our decision in *Bolton* requiring a *Frye* hearing is consistent with the three reported cases in Illinois discussing admissibility of actuarial tests relied upon by experts testifying on the detention of sexually violent persons: *Taylor*, 335 Ill. App. 3d 965, 782 N.E.2d 920, *Hargett*, 338 Ill. App. 3d 669, 786 N.E.2d 557, and *Traynoff*, 338 Ill. App. 3d 949, 789 N.E.2d 865.

The fundamental dispute between this case and *Bolton* is that the majority in this case views any test used by a psychologist as neither scientific nor novel. In my opinion, the various tests are presented as a scientific principle, technique, or test offered as independent support of the expert's subjective opinion.

In this case, for example, the State's expert relied on specific numerical results from tests and testified as to the significance of those numbers. The majority concludes this is not scientific. I am confounded that the majority goes to great lengths to establish that these tests are not scientific and, therefore, should be admitted without the scrutiny of the *Frye* test.

A prime example of the important role played by a *Frye* test is found in *People v. Ferguson*, 172 Ill. App. 3d 1, 526 N.E.2d 525 (1988). There, the trial court admitted testimony from a "shoe[-]print[-] identification" expert who claimed that each person made a unique impression in the wear patterns of the sole of the shoe, which led her to conclude the defendant was responsible for the shoe print left at the

crime scene beyond a reasonable doubt. The appellate court concluded that this testimony failed the *Frye* test in that the expert's theory lacked "general acceptance." *Ferguson*, 172 Ill. App. 3d at 9, 526 N.E.2d at 531. Moreover, as in this case, reliance was placed upon decisions from foreign jurisdictions to establish admissibility of the evidence. *Ferguson*, 172 Ill. App. 3d at 11, 526 N.E.2d at 532.

Finally, despite the fact that the expert in *Ferguson* was the only known shoe-print expert, the trial court found that her testimony was based upon " 'scientific standards of measurement, uniqueness[,] and a relationship between individuals that can be differentiated.' " *Ferguson*, 172 Ill. App. 3d at 10, 526 N.E.2d at 531. The appellate court, though reversing the trial court's finding of admissibility, did conclude that *Frye* analysis looks not just at the results, but the entire theory to determine whether it is a scientific principle, technique, or test of general acceptance.

> "*Frye* identifies the 'thing from which the deduction is made' as a 'scientific principle or discovery.' (*Frye*, 293 F. at 1014.) We construe the 'thing from which the deduction is made' in the instant action as not simply scientific standards of measurement, but rather [the expert's] theory that shoe wear patterns are unique and an identification can be made by comparing them." *Ferguson*, 172 Ill. App. 3d at 11-12, 526 N.E.2d at 532.

In this case, that means examination beyond the questions of "Is this an actuarial test?" or "Is the actuarial test being used by many psychologists?" The question becomes the following: "What is the theory upon which the tests base their prediction of future behavior—the method of selecting factors, the determination of the numeric scale, the revision of testing instruments, *et cetera*?"

According to the majority here, these tests are "[a]ctuarial risk-assessment instruments *** developed by observing those sex offenders who reoffend to determine which 'risk factors' they have in common." 344 Ill. App. 3d at 364. Moreover, the dissent in *Bolton* asserted that these tests were merely "an inference of probability from a sophisticated record-keeping system." *Bolton*, slip op. at 16-17 (Appleton, J., dissenting). However, absent a *Frye* hearing, there is insufficient information in the record of this case to draw such a conclusion.

We concluded in *People v. Canulli*, 341 Ill. App. 3d 361, 369-70, 792 N.E.2d 438, 444 (2003), that an appellate court cannot make such a determination absent a full *Frye* evidentiary hearing held and recorded by the trial court:

> " '[T]he proponent *** must prove general acceptance, by surveying scientific publications, judicial decisions, or practical applications, or by presenting testimony from scientists as to the attitudes

of their fellow scientists.' [Citations.] However, '[u]nless the question of general acceptance has been thoroughly and thoughtfully litigated in the previous cases, *** reliance on judicial practice is a hollow ritual.' [Citation.]"

None of these tests—the Static-99, the Minnesota Screening Tool—Revised, or the Violence Risk Appraisal Guide—have been specifically examined by the trial court in this case. The majority opinion herein relies upon opinions from other states, while rejecting the opinions in Illinois.

But, primarily, I dissent because each of these individual tests, though collectively referred to as "actuarial," is, in fact an independent evaluative process that should be subject to the scientifically rigorous review that *Frye* contemplates. While they may have begun as a diagnostic tool for use by psychologists in making a diagnosis, they are, as in this case, being presented in court as independent evidentiary validation of expert opinions. The numerical score and the categorization of the score from each test is presented as a definitive truth that the expert need only recognize and relay to the jury, such as a machine might analyze physical data in an objective and infallible manner.

In this sense, they are no different than the plethysmograph test designed to measure changes in the circumference of the penis when exposed to video or audio stimuli (see *In re Detention of Hughes*, 338 Ill. App. 3d 224, 788 N.E.2d 370 (2003)) to determine whether the respondent was a sexually dangerous person. The court in *Hughes* concluded that it was error to allow the expert to base his opinion on the results of the plethysmograph, absent a *Frye* determination and any prior determination in any reported case in Illinois. *Hughes*, 338 Ill. App. 3d at 241, 788 N.E.2d at 384.

In *Frye*, the court determined that a test described as the "systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made." *Frye*, 293 F. at 1014. One cannot help but conclude that, given the widespread use of lie-detector tests today, such tests would be admitted under the same arguments that the majority uses in this opinion.